In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1389

COLLEEN BAGLEY, et al.,

*Plaintiffs-Appellants*,

*v.*

ROD R. BLAGOJEVICH, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:05-cv-3156—**Richard Mills**, *Judge*.

ARGUED OCTOBER 22, 2010—DECIDED MAY 2, 2011

Before KANNE, TINDER, and HAMILTON, *Circuit Judges*.

TINDER, *Circuit Judge*.  A group of former captains from the Illinois Department of Corrections (IDOC) sued state and union officials alleging that the defendants unlawfully punished them for seeking to organize with a rival union. One of the defendants is former Illinois Governor Rod Blagojevich. Much of the litigation below, which began in June 2005, focused on plaintiffs' efforts to depose Governor Blagojevich. After a series of motions and

rulings, the district court found the Governor immune from deposition pursuant to legislative immunity and later granted summary judgment to the Governor and the remaining defendants. We affirm the district court's rulings.

## I. Background

When Governor Blagojevich assumed office in January 2003, the state faced a $5 billion budget deficit, or 10% of the state's budget. A Blagojevich campaign plank promised to reduce costs and layers of management in state government. Thus, to reduce the budget gap and fulfill a campaign promise, Blagojevich administration officials required state agencies in early 2003 to find efficiencies in their organizational structures with the goal of saving money.

## A. Blagojevich officials focus on the Illinois Department of Corrections.

Part of the administration's review targeted eliminating management positions in IDOC. Governor Blagojevich's deputy chief of staff Julie Curry (an appellee) was responsible for about fifteen state agencies, including IDOC. In April 2003, IDOC's high security facilities maintained a twelve-level rank structure. The relevant positions up the twelve-layered chain of command were correctional officers, sergeants, lieutenants, captains, majors/chiefs of security, superintendents, and assistant

wardens. At about the same time, IDOC employed 217 captains, 40 majors, and 42 superintendents. Captains performed a variety of supervisory jobs, including that of a "shift commander." Captains performing "shift commander" duties did exactly what the title suggests—they took command of a shift at a facility. Shift commanders reported to the facilities' chiefs of security or higher up the chain of command. Facilities generally maintained three shifts, but some facilities had more than three captains. One facility had 28 captains, but only one captain could command an individual shift at a time. The following diagram represents IDOC's command structure at the time.



The American Federation of State, County and Municipal Employees (AFSCME), Council 31 represented about 37,000 Illinois state employees, including about 10,000 IDOC employees. AFSCME contributed $125,000 to Blagojevich's primary campaign and $250,000 to his general election campaign. AFSCME's RC-6 bargaining unit represented IDOC officers, sergeants, and other security employees. AFSCME's CU-500 bargaining unit represented lieutenants. The captains were not represented. In 2000, the captains began meeting with Illinois State Employees Association (ISEA) representatives. In 2002, ISEA initiated attempts to organize the captains. In March 2003, AFSCME petitioned to have the captains become part of the CU-500 bargaining unit. ISEA intervened to block AFSCME and filed its own petition in April 2003.

In early 2003, Curry began working with James Underwood (an appellee and IDOC personnel director starting in February 2003) and Nancy Bounds (IDOC personnel director but only until June 2003) to identify positions to eliminate or consolidate, including captains, chiefs of security, superintendents, and assistant deputy directors. Curry believed eliminating captains consolidated IDOC management and saved about $17 million annually. Governor Blagojevich proposed a state budget in March 2003 that did not fund the captain position. Yet eliminating the captains would not happen until June 30, 2003, the day before the proposed budget became effective on July 1, 2003.

Curry told AFSCME officials in an April 17, 2003, meeting that Governor Blagojevich would eliminate the

captain position. But on May 23, 2003, the Illinois General Assembly passed a budget that included $17.3 million in funding for the captain position. The Blagojevich administration issued a press release on June 4, 2003, declaring that the Governor would veto various budget items, including funding for "Corrections' Captains" because he could not ask the public "to cover the cost of middle management we just don't need." Governor Blagojevich formally vetoed the line item funding the captain position on June 4, 2003. IDOC eliminated the position on July 31, 2003.

But the process of eliminating the captain position began earlier. A plan for layoffs, dubbed the June 30 Layoff Plan, anticipated reassigning the captains' duties to other positions up and down the chain of command. This plan anticipated giving captains the following options: demotion to another position in state government; demotion to correctional officer within their current facility; or being laid off. Meanwhile, AFSCME opposed offering the captains lower-ranking IDOC positions, particularly that of lieutenant (right below captain). Earlier that year, IDOC received permission to fill 122 lieutenant spots. AFSCME officials made it quite public that IDOC should not offer the position "to people outside the bargaining unit" and that 700-plus AFSCME members had passed an exam making them eligible for the position. A newspaper article quoted the Governor saying that AFSCME appeared "concerned that most of these captains happen to be Republicans and that they shouldn't be hired. . . . They should be able to reapply for other positions in state government and we don't

care what political party they come from." AFSCME filed a grievance on May 28, 2003, complaining that IDOC violated the collective bargaining agreement (CBA) by offering lieutenant spots to the former captains. AFSCME's complaint failed in arbitration.

Meanwhile, eliminating the captains did not make the work performed by the captains go away. On June 17, 2003, IDOC created a new position called "shift commander." Shift commanders performed at least one of the functions carried out by captains: they commanded shifts. Employees with the title major/chief of security and superintendent (the two positions above captain) took some of the shift commander positions and IDOC promoted 55 of the former captains to fill the remaining spots. The following diagram represents IDOC's revised command structure.



Budgetary reasons kept the state from giving IDOC permission to fill all shift commander positions. So IDOC temporarily assigned some lieutenants to serve as shift commanders. Operational needs prevented IDOC from eliminating all superintendent positions and reassigning those individuals as shift commanders. Of the remaining former captains, 83 became lieutenants; 64 became correctional officers; 5 became youth supervisors; and 10 were laid off. Since 2003, Illinois has agreed to an ISEA-represented bargaining unit of shift commanders. Former captains taking lieutenant positions became part of AFSCME's CU-500 bargaining unit. For purposes of determining seniority, the CU-500 CBA provides (emphases supplied):

> Seniority shall, for the purpose of layoff and recall, be continuous service as currently defined and administered by the Rules of the Director of Central Management Services. Seniority for all other purposes shall be the *continuous length of service in the affected employee's classification*, except that employees employed in the CU-500 bargaining unit as of July 1, 1989, shall have his/her length of service prior to July 1, 1989, *whether continuous or not*, in his/her affected classification counted toward his/her seniority.

Because the former captains assumed a different classification, IDOC gave them seniority based on their demotion date. Former captains demoted to the lowest rank of correctional officer were another matter. Officers were in AFSCME's RC-6 unit. The CBA determining seniority for the RC-6 unit differed slightly and perhaps—depending how it is interpreted—meaningfully (emphases supplied):

> Seniority for RC-6 and 9 shall, for the purposes stated in this Agreement, consist of the *length of service of an employee with their department in an AFSCME bargaining unit(s)*, except when a previously excluded position enters a bargaining unit pursuant to labor board procedures, seniority for an employee in that position shall consist of the employee's *total length of service* with their department.

IDOC initially gave captains demoted to officer seniority credit for time previously spent in the

bargaining unit. AFSCME opposed giving the former captains credit. Some existing RC-6 bargaining unit members would lose seniority. Seniority determined bidding rights for shifts, days off, promotions, and the order of layoffs. AFSCME maintained that the language from the RC-6 CBA barred persons entering the RC-6 bargaining unit from receiving seniority credit for past service in the unit. AFSCME argued that the phrase "length of service" actually meant "length of continuous service." IDOC refused to accept AFSCME's position so AFSCME filed a grievance on July 22, 2003. The grievance went to the state's Central Management Services (CMS) for resolution. Before arbitration, CMS determined that the state's position was not viable. AFSCME and IDOC agreed on November 18, 2003, to stipulate that the captains demoted into the RC-6 unit would receive seniority based on "their length of the continuous service . . . beginning with their most recent return to the RC-6 AFSCME bargaining unit."

### B. Some former captains sue state and union officials.

A group of former captains sued current and former Illinois officials (including Governor Blagojevich and Curry) in their individual and official capacities and AFSCME officials in their individual capacities on June 24, 2005, alleging that the defendants unlawfully retaliated against them for seeking to unionize with ISEA. Plaintiffs alleged that defendants violated 42 U.S.C. § 1983 by removing them from their positions as captains and depriving the demoted captains of their

seniority in retaliation for their exercise of their First Amendment rights.

Much of the litigation focused on plaintiffs' attempts to depose the Governor. On February 27, 2007, the state defendants sought a protective order to block plaintiffs from deposing Governor Blagojevich on grounds that it would just "disrupt a busy public official who should not be taken away from his work." R. 46 (citing among other cases *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999)). State defendants maintained that it would never be appropriate to depose the Governor but argued that it was particularly inappropriate unless plaintiffs identified "a particularized need" that could not "be satisfied in a less burdensome manner." Plaintiffs opposed the motion on March 15, 2007, arguing that Governor Blagojevich was not immune from testifying because evidence established that he had evidence explaining the captain position's elimination. Plaintiffs cited the state's initial disclosures stating that Blagojevich had "knowledge concerning his own actions and thought process, but Defendants object to any discovery from the Governor without there being a showing that the Governor has personal knowledge of the subject matter at issue in the case;" the AFSCME defendants' initial disclosure that Governor Blagojevich would have discoverable information regarding the "[d]ecision to eliminate position of captain;" the administration's June 4, 2003, press release announcing the line item veto of the captain position's funding; and a January 13, 2004, statement by the Governor saying why it was necessary to eliminate "all these high-level positions that" did not help IDOC "work better." Plaintiffs argued that

Blagojevich's stated reasons for eliminating the captain position were pretextual and thus, to prove their claim, they had "to inquire into the 'thought process' of the Governor in making this decision."

The magistrate judge denied the state defendants' request on March 28, 2007, because plaintiffs showed that it was likely that Governor Blagojevich possessed "relevant information, such that requiring him to sit for deposition would be reasonable." The state defendants objected on April 10, 2007, and advanced a new argument that the Governor was entitled to legislative immunity from suit and discovery. The state defendants argued that the complaint's basis was Governor Blagojevich's line-item veto because plaintiffs' evidence that Blagojevich participated in the decision was the press release and interview about the veto. Plaintiffs responded on April 26, 2007, citing the initial disclosures and the press release and interview regarding the elimination of IDOC positions as evidence that Governor Blagojevich had relevant evidence, and argued that defendants waived legislative immunity by failing to raise the issue earlier. Plaintiffs also argued that legislative immunity did not prohibit discovery and that legislative immunity is properly raised in a motion to dismiss. The district court adopted the magistrate judge's opinion in its entirety on May 10, 2007, allowing plaintiffs to depose Governor Blagojevich. The court did not address legislative immunity. *See Bagley v. Blagojevich*, 486 F.Supp.2d 786, 787 (C.D. Ill. 2007).

But that was hardly the end of the legislative immunity battle. What happened next frames the case

for purposes of review. On one side, the state attempted to block Governor Blagojevich's deposition by arguing that he was a busy public official who could only be deposed if the former captains showed a particularized need. The state defendants were only partially success-ful. Although the court rejected the "particularized need" standard, the court did require plaintiffs to show "that there is some reason to believe that the deposition will produce or lead to admissible evidence." R. 49 (quoting *Hobley v. Burge*, No. 03 C 3678, 2007 WL 551569, at *2 (N.D. Ill. Feb. 22, 2007) (unpublished)). On the other side, after the former captains showed that it was likely the Governor possessed "relevant information, such that requiring him to sit for deposition would be reason-able," the state argued that the former captains' evidence showing that Blagojevich possessed relevant informa-tion was based on actions protected by legislative im-munity. Government officials are entitled to legislative immunity when their actions "stripped of all consider-ations of intent and motive" are legislative. *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998). Courts first look at whether the action took place "in the sphere of legitimate legislative activity." *Id.* at 54 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Although not mandatory, courts may also look beyond the government officials' "formal actions to consider whether the ordinance was legisla-tive in *substance*." *Bogan*, 523 U.S. at 55.

On May 30, 2007, Governor Blagojevich moved for reconsideration and for a protective order regarding his deposition. The Governor argued that plaintiffs based

their lawsuit on his veto and that the district court did not address legislative immunity. Blagojevich argued that legislative immunity shielded him from testifying "about the motive and/or rationale for his legislative veto, which directly implicates a legislative immunity defense and discovery bar." Blagojevich also argued that with the Illinois General Assembly in session, deposing him would be inconvenient. Blagojevich supplemented this motion on June 19, 2007, asking the district court to strike the deposition notice plaintiffs submitted on June 13, 2007. Plaintiffs responded on June 19, 2007, arguing that Governor Blagojevich improperly raised "legislative immunity" because he failed to raise it when he first opposed the deposition. Plaintiffs argued that legislative immunity is an affirmative defense, that evidence suggested that the Governor's decision to eliminate the captain position before his veto was administrative, not legislative, and that the case involved Governor Blagojevich's motivations in the decision regarding the former captains' seniority. Governor Blagojevich replied June 21, 2007, noting that the state defendants did not mention legislative immunity in their December 16, 2005, answer "because there were no allegations of legislative acts in the Complaint."

Governor Blagojevich filed an emergency motion for a protective order on Friday, June 22, 2007, asking for a stay of his deposition that plaintiffs scheduled for Monday, June 25, 2007. Blagojevich argued that the deposition notice was improper because plaintiffs issued it while the motion to reconsider was pending, with short notice during a legislative session, and without con-

firming defense counsel's availability. That same day, plaintiffs responded and the district court denied Blagojevich's motions to reconsider and for a protective order. But the court ruled separately on Governor Blagojevich's emergency motion for a protective order, staying the deposition due to the "difficulty scheduling the deposition." The court also directed the parties to contact the magistrate judge to schedule the deposition. The parties conferred on June 28, 2007, agreeing not to conduct the deposition until the legislative session ended in "probably late August, 2007." Blagojevich's counsel advised that "he may be seeking a protective order or other relief on the scope of Governor Blagojevich's deposition or otherwise based upon privilege."

On July 25, 2007, Governor Blagojevich renewed his efforts to block his deposition. He argued that legislative immunity barred plaintiffs from deposing him on the captain position's elimination and that in the alternative his deposition should be delayed because of his government position. On August 7, 2007, Governor Blagojevich moved to dismiss the complaint against him pursuant to legislative immunity. He argued that eliminating the captain position was legislative, that the plaintiffs wanted to hold him liable for a budgetary decision, and that the inquiry was based on his "thought process." On August 8, 2007, Curry sought a protective order to limit her deposition's scope pursuant to legislative immunity (excluding IDOC's budget proposals, the captain position's funding, and the veto). Plaintiffs responded September 24, 2007, arguing that the budget changes "were not merely legislative in nature" because others were

placed into positions to perform the same work and that no one performed a budget analysis. Plaintiffs argued that Governor Blagojevich's actions preceding the captain position's elimination were "outside the scope of legislative immunity." Plaintiffs cited the governor's meetings during "budget negotiations which involved negotiations outside the legislative process." Plaintiffs argued that these "meetings were being held in order for the Governor to appease contributors to his campaign." Plaintiffs opposed the motion to dismiss on grounds that legislative immunity, if applicable, did not shield Governor Blagojevich from liability on the seniority aspect of their claim.

On December 7, 2007, the court denied Blagojevich and Curry's motions. Because defendants answered plaintiffs' complaint, the court converted the motion to dismiss to a motion for judgment on the pleadings. The court found "[w]ithout a doubt" that the veto was legislative procedurally, but nothing on the complaint's face suggested that the veto was substantively legislative. Yet the court also found that nothing on the face of the complaint suggested that the decision to deny seniority to the former captains "was accomplished in the form of a legislative act." The court refused to decide whether legislative immunity applied as a testimonial privilege because defendants did not provide sufficient evidence that legislative immunity applied to their actions. The court also noted that neither party provided evidence explaining whether the shift commanders were merely renamed captains. If the shift commanders were renamed captains, the court said the veto would

be administrative. *Bagley v. Blagojevich*, No. 05-3156, 2007 WL 4302434 (C.D. Ill. Dec. 7, 2007).

Governor Blagojevich renewed his protective order motion on January 23, 2008, again on grounds of legislative immunity. Blagojevich provided evidence on whether the shift commanders were simply renamed captains. He argued that the shift commanders had additional responsibilities and that the timing of the shift commander position's creation suggested that it was not simply a renamed captain. The Governor also argued that his deposition would not produce evidence concerning the seniority decision and thus he should not be deposed on that matter due to his government position. On January 25, 2008, Curry renewed her motion for a protective order limiting her deposition's scope. Plaintiffs responded April 14, 2008, arguing that the shift commander position was simply a renamed correctional captain, and that at the very least, a question of fact precluded a legislative immunity finding. Governor Blagojevich filed a renewed motion for judgment on the pleadings on May 22, 2008, pursuant to legislative immunity.

On October 22, 2008, the court granted Governor Blagojevich and Curry protective orders pursuant to legislative immunity. The court did not determine whether shift commanders were renamed captains because it found that the plaintiffs' evidence showed that "the elimination of the captain position had prospective implications . . . and . . . [had] the traditional hallmarks of legislative action." The court prohibited

plaintiffs from seeking discovery from Curry on the IDOC budget, the legislation defunding the captains, and the analysis of the budgetary effects of the position's elimination. The court also found that plaintiffs failed to present evidence suggesting that Governor Blagojevich participated in the seniority decision and decided that deposing Governor Blagojevich would be improper. The court also converted the motion on the pleadings to a motion for summary judgment and deferred its ruling until the parties had an opportunity to present more evidence. *Bagley v. Blagojevich*, No. 05-3156, 2008 WL 4724310 (C.D. Ill. Oct. 22, 2008).

The court granted Governor Blagojevich summary judgment on February 20, 2009, based on its finding that legislative immunity shielded him from liability. The court also found that plaintiffs failed to present evidence connecting Governor Blagojevich to the seniority decision. *Bagley v. Blagojevich*, No. 05-3156, 2009 WL 426399 (C.D. Ill. Feb. 20, 2009).

The AFSCME defendants filed for summary judgment on February 26, 2009, and the remaining state defendants did the same on February 27, 2009. The state defendants argued that there was no evidence of a causal relationship between plaintiffs' union activities and the alleged retaliatory actions. The state defendants argued that the captain position was eliminated to reduce management layers, that the CBA language drove the seniority decision, and that there was no evidence of improper motive or knowledge of plaintiffs' alleged protected activities. The AFSCME officials argued that their

actions related to the former captains' seniority were
protected by various immunity doctrines, and alterna-
tively, that they did not act under color of state law to
deprive the former captains of their First Amendment
rights.

In a September 1, 2009, response to the summary judg-
ment motions, plaintiffs acknowledged:

> . . . that if Governor Blagojevich's actions are en-
> titled to legislative immunity, all of the other
> defendants are entitled to immunity as to [the
> issue of eliminating the captain position]. Given
> that the Court has already granted the motions by
> concluding that qualified immunity has been
> established, this issue has previously been dis-
> posed of. As such, the only issue remaining for
> this Court to decide is whether there is sufficient
> evidence from which a jury could conclude that
> the defendants retaliated against the Plaintiffs
> by eliminating their seniority.

Plaintiffs reasserted their disagreement on legislative
immunity but recognized that the law of the case doc-
trine closed the issue. Plaintiffs argued that defendants
agreed to read the word "continuous" into the CBA to
deny the former captains seniority; that Curry spoke
with the person making the seniority decision; that an
AFSCME official spoke to an administration official;
and that the history of AFSCME and ISEA's battle to
represent the captains suggested that the AFSCME offi-
cials' actions were retaliatory. Plaintiffs alleged that
AFSCME used its campaign contributions to influence

the state officials' decisions related to the former captains' seniority.

The district court granted the remaining defendants summary judgment on January 15, 2010. The court found that plaintiffs failed to show evidence of a conspiracy between AFSCME officials and the Blagojevich administration. Although the court found that the immunity doctrines did not apply to the union officials, the court found that plaintiffs failed to present sufficient evidence linking the AFSCME officials to state action. The court found that its prior legislative immunity determination as to Governor Blagojevich and Curry did not affect the other state and AFSCME defendants' liability as to the captain position's elimination. Yet the plaintiffs "unsuccessfully attempted to tie the Court's earlier decision regarding Blagojevich's immunity to all Defendants." *Bagley v. Blagojevich*, 685 F.Supp.2d 904, 911 (C.D. Ill. 2010). The court noted:

> The fact that a governor enjoys legislative immunity for making a line item veto in a budget bill does not necessarily mean that lower level executive branch officials enjoy the same immunity. In addition, the Plaintiffs' statement that all of the other Defendants are immune is broad enough to include the AFSCME Officials as well.

> The Plaintiffs have attempted to put words into the mouth of the Court. The Court's determination regarding the immunities enjoyed by former Governor Blagojevich and Curry are each separate determinations, compartmentalized from the rest of the case and the rest of the Defendants. Immu-

> nity is not automatically imputed to other Defendants.
>
> The Plaintiffs have thrown up their hands on the matter of the elimination of the Captain Position. They have not responded to the State Officials' contentions on this claim, and they have not made any alternative arguments. The Plaintiffs have made no effort to effectively argue their case. Instead, they point out an earlier disagreement they had with the Court that is not necessarily controlling on the issue.

Because plaintiffs failed to respond to the state officials' arguments on the remaining issues, the court found that they waived the issue "by making no real argument on the claim." *Id.* The court went on to find that plaintiffs failed to present evidence of a causal link between the ISEA organizing activities and the seniority decision. The court found that the interpretation of the CBA "was not objectively unreasonable," *id.*, and that there was not enough evidence that state officials influenced the seniority decision. Plaintiffs filed a timely appeal from the final judgment entered in favor of all of the defendants.

## II.  Standard of Review

We review a district court's grant of summary judgment de novo. *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan*, 602 F.3d at 849 (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)). We construe facts favorably to the nonmoving party and grant the nonmoving party "all reasonable inferences" in its favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010) (citing *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)).

Although this is a § 1983 case alleging retaliation for the plaintiffs' union-organizing activities, the former captains argue that summary judgment should be granted "quite cautiously in employment discrimination" cases because issues of intent and motivation are "inherently fact driven." The former captains cite *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993), where we noted that the summary judgment standard "is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues."

In *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997), we clarified the propriety of summary judgment when intent is an issue in employment cases. We noted that language in some cases implied "that because intent is a critical issue in employment discrimination cases, summary judgment is unlikely to be appropriate." *Id.* (citing *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 918 (7th Cir. 1996); *Sarsha*, 3 F.3d at 1038, 1042; *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312-13 (7th Cir.1989)). We explained that "there is not a separate rule of civil procedure governing summary judgment in

employment discrimination cases." *Wallace*, 103 F.3d at 1396. The cases indicating the importance of intent mean that "courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *Id.*

We explained the "added rigor" phrase further in *Alexander v. Wisconsin Department of Health & Family Services*, 263 F.3d 673, 681 (7th Cir. 2001) (footnote omitted):

> Although it is understandable how one might infer from our regular use of this phrase that we meant to communicate a more stringent standard to be used in reviewing employment cases, the original use of this phrase indicates that it was merely included to stress the fact that employment discrimination cases typically involve questions of intent and credibility, issues not appropriate for this court to decide on a review of a grant of summary judgment. Thus, regardless of our inclusion of the phrase "added rigor" in prior cases, we review a district court's decision to grant a motion for summary judgment on a claim involving issues of employment discrimination as we review any case brought before this court involving the review of a grant of summary judgment.

As we held in *Alexander*, our review of the district court's grant of summary judgment in this case is no different from any other case. If a genuine dispute as to a material

fact exists, such as intent, summary judgment is inappropriate. But that genuine dispute must be supported by "sufficient evidence . . . [to permit] a jury to return a verdict for" appellants. *Egonmwan*, 602 F.3d at 849 (quoting *Faas*, 532 F.3d at 640-41).

### III.  Analysis

At oral argument, the former captains' counsel argued that Governor Blagojevich's actions *after* his veto did not constitute legislative action; rather, such actions are administrative. Yet at the district court the former captains' targeted the line-item veto and the seniority decision as Governor Blagojevich's alleged retaliatory acts. At times the former captains alleged that actions *before* the line item veto constituted administrative actions and the parties disputed whether the "shift commander" position was merely a renamed captain. Yet the former captains never tied Governor Blagojevich to any alleged retaliatory action that happened before or after the veto.

Early in discovery, the evidence the former captains cited tying Governor Blagojevich to the captain position's elimination consisted of a press release announcing the veto and an interview on eliminating IDOC positions. The former captains cited this evidence because the Governor tried to block his deposition by arguing that his high-ranking public official status justified requiring plaintiffs to show that deposing him would lead to admissible evidence. *See Stagman*, 176 F.3d at 994-95 (holding that the court did not abuse its

discretion in finding that deposing Illinois's attorney general "would serve no useful purpose"); *Olivieri v. Rodriguez*, 122 F.3d 406, 409-10 (7th Cir. 1997) (noting that busy officials "should not have to spend their time giving depositions in cases arising out of the performance of their official duties unless there is some reason to believe that the deposition will produce or lead to admissible evidence"). And the former captains defeated Governor Blagojevich's initial attempts to avoid his deposition because of the evidence tying him to the veto. The magistrate judge found on March 28, 2007, that:

> . . . Governor Blagojevich is likely to possess relevant information, such that requiring him to sit for deposition would be reasonable. . . . Plaintiffs allege that the Governor was either the ultimate decision maker or at least personally involved in the decision to eliminate the correctional captain position. As support, Plaintiffs have provided the Court with a June 4, 2003 press release from the Office of the Governor, in which the Governor personally takes credit for the decision to eliminate the correctional captain position, as well as a newspaper article containing similar comments.

*Bagley v. Blagojevich*, No. 05-3156, 2007 WL 951921, at *3 (C.D. Ill. Mar. 28, 2007). The district court expressly adopted the magistrate judge's opinion in its entirety on May 10, 2007, denying Governor Blagojevich's initial effort to block his deposition. *See Bagley*, 486 F.Supp.2d at 787.

The former captains did not show how Governor Blagojevich participated in the decision to fill some of

the former captains' responsibilities with shift com-
manders or any other post- or pre-veto actions that
could be construed as administrative. And the former
captains do not appeal the lower court's decision that
Blagojevich's high-ranking public official status justifies
requiring plaintiffs to show that he was "likely to possess
relevant information, such that requiring him to sit for
deposition would be reasonable." *Id.* at 789. Because of
this posture, we proceed to determine whether the
district court erred in finding that legislative immunity
covered Governor Blagojevich's veto. Deciding whether
legislative immunity covers post- or pre-veto acts would
be irrelevant because the former captains did not pre-
sent evidence that Governor Blagojevich partic-
ipated in those decisions.

As for the remaining defendants, the former captains
fail to acknowledge that the district court's decision
granting legislative immunity to Governor Blagojevich's
veto (and Curry's involvement) did not relate to the
other defendants' involvement in the position's elimina-
tion. As argued by the former captains' counsel at oral
argument, the post-veto actions may not be legislative;
rather, decisions such as creating a new position may
be administrative and unprotected by legislative immu-
nity. But the former captains fail to explain why the
district court erred in finding that they waived the
issue related to the non-Blagojevich defendants "by
making no real argument on the claim." Indeed, the
former captains' response to the non-Blagojevich defen-
dants' motions for summary judgment acknowledges
"that if Governor Blagojevich's actions are entitled to

legislative immunity, all of the other defendants are entitled to immunity as to" the captain position's elimination. Thus, the former captains pin their case against the non-Blagojevich defendants' participation in the position's elimination on overturning the court's legislative immunity decision. *See* Reply Br. of Pls'-Appellants at 1 ("This case presents largely a narrow question: 'is a line item veto by a Governor per se entitled to legislative immunity?'")

## A. Legislative immunity

Our discussion of whether legislative immunity covered the veto starts with the Supreme Court's unanimous *Bogan* decision.[1] "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legisla-

---

[1] We acknowledge that there is an argument regarding whether state officials generally, and Governor Blagojevich in particular, are entitled to claim legislative immunity pursuant to federal common law or state law, which in this case would be Illinois law. *Compare Empress Casino Joliet Corp. v. Blagojevich*, Nos. 09-3975 & 10-1019, ___ F.3d ___, 2011 WL 710467, at *7-9 (7th Cir. Mar. 2, 2011), *partially vacated on unrelated grounds by Amended Order Granting Rehearing En Banc (Apr. 13, 2011), with id.* at *18-22 (Posner, J., dissenting) (citing *Jorgensen v. Blagojevich*, 811 N.E.2d 652 (Ill. 2004)). We do not comment on that issue other than to note that the former captains did not argue that Illinois law applied to the issue of legislative immunity and appear content with having the issue decided under federal law as they do not raise any state law issues on appeal and appear to have never raised the matter before the district court.

tive activity.'" 523 U.S. at 54 (quoting *Tenney*, 341 U.S. at 376). Whether an action is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* Legislative acts include signing and vetoing bills because they are "integral steps in the legislative process." *Id.* at 55 (citing *Edwards v. United States*, 286 U.S. 482, 490 (1932); *Smiley v. Holm*, 285 U.S. 355, 372-73 (1932)).

In *Bogan*, an administrator of a city's health and human services department received a complaint that an employee temporarily under her supervision "made repeated racial and ethnic slurs about her colleagues." 523 U.S. at 46. As the administrator prepared to fire the employee, the employee "used her political connections to press her case with several state and local officials." *Id.* The city council held a hearing and accepted a settlement where the employee was suspended without pay for 60 days, but the city's mayor later substantially reduced the punishment. *Id.* at 47. As the charges against the employee pended, the mayor prepared a budget that froze salaries and eliminated 135 positions because of an anticipated reduction in state assistance. *Id.* The budget also eliminated the administrator's department, of which she was the only employee. *Id.* The council adopted the proposal and the mayor signed the bill, eliminating the administrator's position. *Id.*

The administrator sued the city, its mayor, and other city officials, alleging that her position's elimination "was motivated by racial animus and a desire to retaliate against her for exercising her First Amend-

ment rights in filing the complaint." *Id.* A jury found the city, its mayor, and another official liable because the administrator's speech was a substantial or motivating factor in her position's elimination. *Id.* at 47-48. The First Circuit affirmed the judgment against the mayor and the official, holding that the positions' elimination was not legislative because the mayor and the official individually targeted the administrator and "treated her differently from other managers." *Id.* at 54 (quoting *Scott-Harris v. City of Fall River*, 134 F.3d 427, 441 (1st Cir. 1997)).

The Supreme Court reversed. The Court held that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. The privilege of absolute immunity 'would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.'" *Bogan*, 523 U.S. at 54 (quoting *Tenney*, 341 U.S. at 377). A defendant acts "in a legislative capacity even though he allegedly singled out the plaintiff for investigation in order 'to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights.'" *Id.* at 55 (quoting *Tenney*, 341 U.S. at 371). The Court "stripped . . . considerations of intent and motive" and examined whether the actions were legislative. *Id.* at 55.

*Bogan* first looked at whether the acts were "in form, quintessentially legislative." *Id.* The Court had "little

trouble concluding that they were." *Id.* Introducing, voting, and signing into law a budget were "formally legislative" actions even though an executive official (the mayor) introduced and signed the budget. *Id.* The mayor's actions "were legislative because they were integral steps in the legislative process." *Id.*

That almost ended the matter. But the Court addressed the plaintiff's request "to look beyond petitioners' formal actions to consider whether the ordinance was legislative in *substance*." *Id.* The Court noted that it did not need to "determine whether the formally legislative character of petitioners' actions is alone sufficient to trigger legislative immunity because here the ordinance, in substance, bore all the hallmarks of traditional legislation." *Id.* "The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents." *Id.* at 55-56. The action involved "the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56. The city council's elimination of the department was an action "in a field where legislators traditionally have power to act." *Id.* (quoting *Tenney*, 341 U.S. at 379).

The parties' briefs indicate that we should apply the two-part test even though *Bogan* does not explicitly require an inquiry into the action's substance. We will examine the action's substance because it helps illuminate what actions are included "in the sphere of

legitimate legislative activity." *Id.* (quoting *Tenney*, 341 U.S. at 376).

To determine whether an act is legislative in form, courts look at whether the defendants acted pursuant to constitutional or statutory procedures. *See State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 90-91 (2d Cir. 2007) (concluding that it was unclear whether the alleged actions were "integral steps in the statutory budget process"); *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 774 (3d Cir. 2000) ("In addition, the act must be 'procedurally' legislative, that is, passed by means of established legislative procedures." (quoting *Ryan v. Burlington Cnty., N.J.*, 889 F.2d 1286, 1291 (3d Cir. 1989))); *Macuba v. Deboer*, 193 F.3d 1316, 1321 (11th Cir. 1999) (examining a county code to determine whether a board of commissioners had authority to take the action that formed a basis of the claim). *Bogan* asks whether the actions "were integral steps in the legislative process." 523 U.S. at 55.

Without a doubt, the act of vetoing a line item in a bill constitutes an "integral" step in Illinois's "legislative process." Illinois's Constitution gives the state's governor authority to exercise a line-item veto over appropriation bills. Ill. Const. art. IV, § 9(d) ("The Governor may reduce or veto any item of appropriations in a bill presented to him."). *Bogan* also recognized that a governor's vetoing of a bill is part of the legislative process. 523 U.S. at 55 (citing *Smiley*, 285 U.S. at 372-73). The former captains do not expressly acknowledge that Governor Blagojevich's veto was legislative in form; rather they forfeit this point by failing to argue it in their opening

brief. State appellees' opening brief raises appellants' forfeiture, Br. of State Defs'-Appellees 25, and appellants' reply brief does not challenge this. *See generally* Reply Br. of Pls'-Appellants 1-10. Thus, we conclude that Governor Blagojevich's action in vetoing the provision funding the captain position was legislative in form.

This could be the end of the discussion. Yet like the Supreme Court in *Bogan*, we will look at the action's character to determine whether the action substantively "bore all the hallmarks of traditional legislation." 523 U.S. at 55. *Bogan* explained that eliminating positions qualifies as legislative in substance if it reflects "a discretionary, policymaking decision implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents." *Id.* at 55-56. The decision to eliminate a position is "unlike the hiring or firing of a particular employee" because eliminating positions "may have prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56.

Our precedent supports the distinction between the firing of an employee and the elimination of a position. In *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 808 (7th Cir. 2003), we held that *Bogan* kept "state and local officials [from being] mulcted . . . on account of introducing, voting for, or signing legislation." Thus, legislative immunity attached to a county executive's role of "transmitting a budget" from the department of public works to the county board, which enacted the budget, eliminating the plaintiff's position. *Id.* In *Strasburger v. Board of Ed-*

*ucation, Hardin County Community Unit School District No. 1*, 143 F.3d 351, 355 & n.1 (7th Cir. 1998), we noted that a school board's dismissal of an employee through a reduction in force due to low class enrollments and the need to "conserve funds" could justify legislative immunity for the board members under *Bogan*, but the board members failed to raise the defense.

Legislative immunity claims are not successful when the action relates to the firing of a specific individual rather than the elimination of positions. In *Baird v. Board of Education for Warren County Unit School District No. 205*, 389 F.3d 685, 696 (7th Cir. 2004), legislative immunity did not attach to a school board's termination of a principal for reasons cited in an evaluation. The board argued that the individual board members were immune because the actions taken to fire the employee— such as "the determination of rules and procedures, participation in the pre-termination hearing and individual decisions to" fire the employee—were legislative acts. *Id.* But we found that the activities were not "taken in the sphere of legitimate legislative activity" because they involved an employee's termination, which was an administrative act. *Id.* (quoting *Bogan*, 523 U.S. at 54).

Other circuits apply the same distinction between actions that involve the elimination of positions for policy reasons (legislative actions) and actions that result in an individual's termination for reasons that relate to that individual (administrative actions). In *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009), an

official developed a budget that eliminated an em-
ployee's position. The employee alleged that the budget
proposal was "an artifice for what was in fact a retaliatory
personnel decision." *Id.* at 1303. The court held that
"[u]nlike the termination of an individual employee,
the elimination of a public employment position 'may
have prospective implications that reach well beyond
the particular occupant of the office.'" *Id.* at 1306
(quoting *Bogan*, 523 U.S. at 56). A "decision to abolish
the position" and prepare the budget proposal "is
properly construed as embodying a policy decision
with prospective implications." *Id.* at 1306-07. Even though
the "facts obviously suggest an improper motive," *id.* at
1307, the court held that a "claim of an unworthy purpose
does not destroy the privilege." *Id.* (quoting *Tenney*,
341 U.S. at 377). Thus, the court refused to consider the
official's intent or motive in preparing the budget. *Bryant*,
575 F.3d at 1307.

In *Baraka v. McGreevey*, 481 F.3d 187, 199 (3d Cir. 2007),
the court granted legislative immunity to a governor
who signed, and a state arts council's chairperson who
advocated for, legislation eliminating the plaintiff's
position. The plaintiff, the state's poet laureate, created "an
outcry" after reading a poem that the governor said
implied that "Israelis had known about the September 11
terrorism attacks." *Id.* at 194 (quoting a statement from
the governor's spokesperson). The court held that the
actions were substantively legislative because the law
"eliminated the position of poet laureate, a position
that was legislatively created. Eliminating the position

of poet laureate constitutes the type of 'policy-making' that traditional legislation entails, and the actions here were substantively legislative." *Id.* at 199 (citing *Gallas*, 211 F.3d at 774). The officials' motive and intent were "immaterial to whether certain acts [were] entitled to legislative immunity." *Id.* at 200 (citing *Bogan*, 523 U.S. at 54-55). Consistent with this distinction, *Fowler-Nash v. Democratic Caucus of the Pennsylvania House of Representatives*, 469 F.3d 328, 340 (3d Cir. 2006), held that because the alleged actions "did not reach beyond a single employee," and did not eliminate a position "thereby affecting future employees," the defendants were not acting legislatively when they terminated the plaintiff. The decision "did not rely on any broad consideration of policy, neither was it directed to creating a new policy." *Id.* The situation was "a textbook example of a legislator performing an administrative function." *Id.*

Governor Blagojevich's elimination of the captain's position through his budget proposal and his line item veto substantively attempted to reduce management positions in order to save money. Perhaps the Governor harbored secret motives, but motives do not matter in determining whether the action is legislative. *See Bogan*, 523 U.S. at 54 ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."); *Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege."). Governor Blagojevich's veto targeted cutting costs and eliminating management positions. Nothing in the record suggests that the Governor targeted particular employees; rather, he tar-

geted the positions. Thus, Governor Blagojevich's line-item veto was substantively a legislative act and not administrative.

The former captains argue that state officials did not perform a budgetary analysis or determine whether "there was any financial benefit to eliminating" the captain position. Yet state officials believed they could save $17 million a year by eliminating 200-plus captain positions and reduce the total number of IDOC positions by 162. Governor Blagojevich also explained in a press release that the decision to eliminate the captain position was an attempt to reduce "the cost of middle management we just don't need."

The former captains argue that the creation of "a nearly identical position" after the captain position's elimination shows that the decision was administrative. This contention lacks citation to the record and is a mere assertion without details supporting the conclusion. Failure to "show how any evidence in the record tends to support such a claim" generally results in a waiver of the argument. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 384 (7th Cir. 2008). Yet the former captains' opening brief's fact section details the issue sufficiently for us to address this contention because this case demonstrates how this was not a one-for-one replacement of disfavored employees with more favored individuals to do the same work.

Some responsibilities overlapped and some former captains performed duties similar to the shift commanders, but not to a degree that the reorganization

was not prospective. The reorganization reduced the command structure from twelve to ten positions, merging major/chief of security, superintendent, and captain positions into a single major/shift commander position. Assistant wardens of operations took over many of the duties performed by the majors/chiefs of security. The shift commanders also started to regularly command shifts as the high number of captains at certain facilities kept captains from regularly commanding shifts. This reorganization "reflected a discretionary, policymaking decision implicating the budgetary priorities" of the government. *Bogan*, 523 U.S. at 55. The veto terminated "a position, which, unlike the hiring or firing of a particular employee," had "prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56. This elimination of a position is "a field where legislators traditionally have power to act," *id.* (quoting *Tenney*, 341 U.S. at 379), and plaintiffs have not shown us why this case is otherwise.

The former captains cite *Canary v. Osborn*, 211 F.3d 324 (6th Cir. 2000), in arguing that we should look closely at Blagojevich's actions to determine whether they bore the "hallmarks of traditional legislation." In *Canary*, an assistant principal sued school board members after they demoted him. *See* 211 F.3d at 327-28. The board members claimed legislative immunity protected their decision. *Id.* at 328. On appeal, the Sixth Circuit affirmed the finding that the board members were not entitled to legislative immunity because the record did not indicate that they made the decision for budget reasons. *See id.* at 330. The record indicated that the action was not a

position's elimination because the board assigned others to fill the plaintiff's old position and to fulfill his former job duties. *See id.* at 330-31. *Canary* is distinguishable from this case in an instructive manner: it involved the replacement of an individual with other individuals with the same title or duties. Here, the individuals in the "shift commander" position took up additional responsibilities and the action reorganized and streamlined IDOC's command structure.

The former captains also cite *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1 (1st Cir. 2000), in arguing that Governor Blagojevich's decision targeted "individuals currently employed as Captains." In *Acevedo-Garcia*, a group of current and former city employees sued the city, its mayor, and others under 42 U.S.C. § 1983, alleging they were fired or that their work conditions were made worse for political reasons. *See* 204 F.3d at 4. Two ordinances eliminated positions (almost all affiliated with the disfavored party) and detailed layoffs. *See id.* at 5. The defendants asserted legislative immunity. *See id.* at 4. The First Circuit affirmed the district court's rejection of immunity because the replacement of the employees with politically connected workers and the political harassment did not reflect a discretionary policymaking decision. *See id.* at 8. The political discrimination was not "prospective" and did not "reach well beyond the particular occupant of the office." *Id.* (quoting *Bogan*, 523 U.S. at 56). Rather, it "targeted specific individuals affiliated with" the disfavored party. *Id.*

*Acevedo-Garcia* is distinguishable from this case because the record does not indicate that the state officials eliminated the captain position because of political allegiances. The closest the record comes to indicating that the former captains' politics were involved is Governor Blagojevich's statement that apparently AFSCME was "concerned that most of these captains happen to be Republicans and that they shouldn't be hired." This quote does not indicate that a belief as to the former captains' political affiliation drove the state officials' decision because in the very next part of the quote the Governor says that the former captains "should be able to reapply for other positions in state government and we don't care what political party they come from." And 55 of the former captains were promoted to shift commander. Of the other former captains, 83 took lieutenant positions, 64 took correctional officer positions, and 10 accepted layoffs. Governor Blagojevich's veto did not target individuals; rather, it targeted a broad category of employees who held the same position, not for the employees' political allegiances, but to reduce layers of management.

Because we find that Governor Blagojevich's veto was legislative, we also hold that the district court did not abuse its discretion in blocking the Governor's deposition and limiting Curry's deposition. In *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (per curiam), the Court held in dismissing a civil suit that legislative immunity protected legislators engaged in legislative actions "not only from the consequences of litigation's results but

also from the burden of defending themselves." In *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502-03 (1975), the Court held that civil actions force legislators to "divert their time, energy, and attention from their legislative tasks to defend the litigation. Private civil actions also may be used to delay and disrupt the legislative function." The court reaffirmed "that once it is determined that" a legislator is "acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference." *Id.* (quoting *Doe v. McMillan*, 412 U.S. 306, 314 (1973)). In *Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 731-32 (1980) (citations omitted), the Court held that although separation of powers "justifies a broader privilege for Congressmen than for state legislators" the Court generally equates "the legislative immunity to which state legislators are entitled under § 1983 to that accorded Congressmen under the Constitution." We see no reason why the immunity protecting the Governor from liability for his veto (and Curry to the extent of her involvement in the veto) would not also protect them "from the burden of defending themselves," *Dombrowski*, 387 U.S. at 85, for their actions " 'in the sphere of legitimate legislative activity.' " *Id.* (quoting *Tenney*, 341 U.S. at 376).

The former captains cite *Rowland*, 494 F.3d at 71, in arguing that the court should decide whether legislative immunity applied after more discovery. In *Rowland*, the court upheld the denial of a motion to dismiss, which the defendants based partially on legislative immunity. *See id.* at 76. The court held that additional discovery

was "necessary to determine whether defendants' acts were indeed procedurally legislative under *Bogan*." *Id.* at 90. Yet *Rowland* held that the district court erred in focusing on "defendants' motives when concluding that discovery was warranted." *Id. Rowland* also required discovery to determine whether the actions in question were substantively legislative. 494 F.3d at 92. The pleadings only alleged that the employees were fired "for illegal reasons," not that their positions' budget lines were eliminated. *Id.*

The former captains also cite *Jaggers v. City of Alexandria*, No. 08-5213, 2009 WL 233244, at *5 (6th Cir. Feb. 2, 2009) (unpublished) for its holding that legislative immunity could not be determined on a complaint's face. There, a city council rejected plaintiffs' development plan. The developers sued the city and the council members under 42 U.S.C. § 1983. *See id.* at *2. The council members moved to dismiss on legislative immunity grounds. *Id.* The court held that nothing in the record established that the development plan's rejection was legislative and not "managerial or administrative." *Id.* at *5. Although the council members had authority to disapprove of development plans, there was "no allegation or evidence . . . establishing that the [legislative] procedures" were the procedures used "rather than their managerial or administrative powers." *Id.* Thus, discovery was necessary to determine whether these actions were legislative. *See id.* The court also held that discovery was necessary to determine whether the actions were substantively legislative, or that the "decision evidenced broad-based policy decisions." *Id.*

The former captains claim that additional discovery is necessary to determine whether Blagojevich acted legislatively. But the former captains do not explain how deposing the Governor (or Curry more extensively) would lead to such evidence. *Rowland* does not give the former captains an automatic right to depose Governor Blagojevich; rather *Rowland* requires additional discovery when the pleadings do not explain how the alleged action was performed. 494 F.3d at 92 ("Plaintiffs do not allege in their amended complaint that defendants 'terminat[ed] the budget lines' that would have funded their positions or that defendants eliminated the positions through other means." (citation omitted)). We know how the Governor's actions contributed to the captain position's elimination: Governor Blagojevich vetoed legislation funding the position. As noted above, the former captains failed to present evidence connecting Blagojevich to other actions and waived arguing that the other non-Blagojevich defendants participated in the captain position's elimination in non-legislative capacities. Procedurally, Governor Blagojevich vetoed the captain position's funding pursuant to his state constitutional authority. Substantively, the evidence shows that the veto of the captain position's funding was pursuant to a broad-based policy targeting certain positions believed unnecessary. Both *Rowland* and *Jaggers* also involved motions to dismiss and are thus materially different from this case where the parties had ample opportunities for discovery on whether the captain position's elimination was an administrative or legislative act.

The district court did not err in finding that legislative immunity protected Governor Blagojevich's veto of the captain position's funding, nor did it err in finding that the former captains waived their claim against the other non-Blagojevich defendants "by making no real argument on the claim."

## B. Seniority Decision

The former captains raise three areas of evidence to support their argument that the district court improperly found that there was insufficient evidence of causation on whether the seniority decision was retaliatory: (1) that state officials agreed to read the CBA language in contravention to what it says in an effort to punish the former captains; (2) that AFSCME officials' contact with a Blagojevich administration official and Curry's conversations with a CMS official suggest that defendants influenced the seniority decision; and (3) that the district court ignored the battle between AFSCME and ISEA over representing the captains.

When IDOC eliminated the captain position, 64 former captains took correctional officer positions. AFSCME opposed giving seniority credit to the former captains for the time the former captains spent in the officer's RC-6 bargaining unit. AFSCME argued that the RC-6 CBA determined seniority based on their "continuous length of service," even though the CBA does not include the word "continuous" in explaining the seniority calculation. The RC-6 CBA states (emphasis supplied):

> Seniority for RC-6 and 9 shall, for the purposes stated in this Agreement, consist of the *length of service of an employee with their department* in an AFSCME bargaining unit(s), except when a previously excluded position enters a bargaining unit pursuant to labor board procedures, seniority for an employee in that position shall consist of the employee's *total length of service* with their department.

IDOC refused to change its plans so AFSCME filed a grievance that proceeded to CMS. CMS determined that the state's position was not viable. AFSCME and IDOC entered an agreement on November 18, 2003, that stipulated that the former captains demoted into the RC-6 unit would receive seniority based on "their length of the continuous service . . . beginning with their most recent return to the RC-6 AFSCME bargaining unit." The former captains allege that state and AFSCME officials agreed to read "continuous" into the CBA to harm them.

Yet the agreement to read "continuous" into the CBA language was not so unreasonable as to suggest an attempt to harm the former captains. The language taken as a whole suggests that "length of service" essentially means "continuous length of service" because the same provision calculates another group of employees' seniority based on "the employee's total length of service with their department." Without reading the term "continuous" into the first category, the term "total" in reference to the second category becomes redundant. The former captains also do not contest that the provi-

sion has been interpreted to read "continuous length of service" in previous situations. The AFSCME defendants also presented evidence that AFSCME proposed the provision to prevent non-bargaining unit employees moved back into the unit from receiving prior service credit. Previously, existing members were laid off because they accrued less total seniority than former management employees. Plaintiffs' only argument against this evidence is that the agreement's "clear language" contradicts this reading. The provision's alleged clarity aside, plaintiffs do not contest AFSCME's reasons for proposing the provision.

That the provision governing the seniority calculation in the CU-500 bargaining unit (covering lieutenants) includes the phrase "continuous" does not control the reasonableness of the interpretation of the RC-6 CBA language. The CU-500 CBA states (emphasis supplied):

> Seniority shall, for the purpose of layoff and recall, be continuous service as currently defined and administered by the Rules of the Director of Central Management Services. Seniority for all other purposes shall be the *continuous length of service in the affected employee's classification*, except that employees employed in the CU-500 bargaining unit as of July 1, 1989, shall have his/her length of service prior to July 1, 1989, *whether continuous or not*, in his/her affected classification counted toward his/her seniority.

The CU-500 CBA seniority calculation turns on the phrase "continuous," while the RC-6 CBA seniority

calculation turns on the phrase "total." The RC-6 CBA determines seniority on whether the employee's length of service is either "the employee's total length of service" or simply "the length of service of an employee." The CU-500 CBA determines seniority by either the length of service "whether continuous or not" or "the continuous length of service." That two contracts use different words to delineate the seniority calculation—and that CMS eventually agreed with an interpretation favoring AFSCME—does not provide sufficient evidence that reading the CBA language in AFSCME's favor was an effort to harm the former captains.

The former captains cite a meeting AFSCME official (and appellee) Henry Bayer had with Blagojevich's chief of staff Alonzo Monk to discuss the seniority issue. Bayer testified that the issue was "a very, very hot issue for us" because "these people were going to be coming into our bargaining unit and bringing in seniority, which might potentially enable them to bump one of our members who has weekends off." Bayer's deposition suggests that he met with Monk to protect the interests of existing AFSCME members. Nowhere does Bayer indicate that he met with Monk to punish the former captains. Bayer also testified that CMS chief counsel for labor relations Nancy Pittman made the decision on how to interpret the CBA and that he could not get Curry to change the administration's position on the seniority issue.

The former captains point to Curry's acknowledgment that she spoke to Pittman about the grievance as

evidence that CMS did not act independently. But nothing about Curry's testimony suggests that she influenced Pittman. Curry said she talked to Pittman about the grievance to get information about the case's progress and the ultimate decision. Curry testified that Pittman resolved the grievance on her own and "on the merits of the case." The former captains argue that if CMS acted independently, Curry would have had "no reason" to talk to CMS. The former captains overstate a meeting's significance. As deputy chief of staff, Curry oversaw a review of Illinois agencies' organizational structures. Curry worked with IDOC personnel directors in 2003 to identify IDOC positions to eliminate and consolidate. There are many reasons for Curry to meet with Pittman but there is no evidence that Curry met with Pittman to influence her decision.

The former captains only briefly mention their claim against the AFSCME officials. Because the former captains sued the AFSCME officials in their individual capacities, the former captains had to prove that the AFSCME officials were "willful participant[s] in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980); *accord Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (holding that a person could be a state actor "because he has acted together with or has obtained significant aid from state officials").

AFSCME and ISEA's competition to represent the captains is not sufficient evidence that the AFSCME officials' communications with state officials regarding the seniority issue were retaliatory. The former captains

argue that AFSCME "went as far as to file intervention petitions seeking to represent the Captains" demonstrating "the history of the battle over who would represent the Captains." But the former captains do not cite evidence that a desire to harm the former captains motivated the AFSCME officials. The evidence indicates that AFSCME officials acted to protect existing members. The former captains' reply brief argues that a quid pro quo existed because AFSCME's financial support of Blagojevich's campaign meant that it "wanted something in return." We can reasonably infer that AFSCME expected something in return for its campaign contributions, but that alone does not reasonably lead to the inference that what AFSCME officials wanted in return was retaliation against the former captains.

The former captains allege that the AFSCME officials "engaged in a conspiracy with the State Officials" based on Bayer's communications with state officials and "the resolution of the union grievance against" the former captains. Communications with state officials and a complaint's resolution against the former captains but in favor of existing AFSCME members is not sufficient evidence to demonstrate a conspiracy. The former captains fail to cite any evidence suggesting that a desire to punish the former captains motivated the AFSCME officials' actions. The AFSCME officials' communications with state officials and the resolution of the grievance in AFSCME's favor certainly suggest that the AFSCME officials attempted to influence state officials, and perhaps their efforts caused the state officials to resolve the grievance in their favor. But that is where the reason-

able inference ends. The former captains failed to show that a genuine dispute exists regarding the AFSCME officials' intent in influencing state officials.[2]

### IV. Conclusion

We AFFIRM the district court's judgment.

---

[2] Because we find that the AFSCME officials' conduct did not constitute state action, we do not address the AFSCME officials' arguments that they are immune under the *Atkinson* doctrine, *see Atkinson v. Sinclair Ref. Co.*, 370 U.S. 238, 247-49 (1962), or the *Noerr-Pennington* doctrine. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140-45 (1961).