2025 IL App (2d) 240153
No. 2-24-0153
Opinion filed September 18, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ANTHONY P. SCIARRONE, BILLY DICKERSON, and JOSEPH RIVERA, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 20-L-730 |
| THE VILLAGE OF ISLAND LAKE, ILLINOIS; CHARLES AMRICH; WAYNE SCHNELL; and MARK BEESON, | ) ) ) ) ) | Honorable Luis A. Berrones, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs Anthony P. Sciarrone, Billy Dickerson, and Joseph Rivera are former police officers for the Village of Island Lake, Illinois (Village). Plaintiffs claimed that they found evidence of criminal wrongdoing by defendants Charles Amrich, Wayne Schnell,[1] Mark Beeson, and the Village. Plaintiffs reported this alleged wrongdoing to state and federal authorities. Defendants then instituted an independent investigation of plaintiffs. After the results of the

---

[1]According to plaintiffs' brief, Schnell was ultimately dismissed as a defendant. He is not a party to this appeal.

investigation were revealed, Sciarrone and Dickerson were terminated from their employment with the Village. Later, Rivera resigned. Thereafter, plaintiffs filed a two-count complaint, alleging in count I that all defendants violated the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2018)) and in count II, directed only against the Village, that it was liable for retaliatory discharge. After the trial court granted summary judgment against each plaintiff with respect to all claims, plaintiffs filed a notice of appeal. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶ 2                               I. BACKGROUND

¶ 3      On October 28, 2020, plaintiffs filed a "Complaint for Damages Due to Retaliatory Discharge and Violation of the Illinois Whistleblower Act" (Complaint). In the Complaint, plaintiffs alleged as follows. Plaintiffs were employed by the Village until they lost their jobs due to actions taken by Village officials. During the time periods relevant to plaintiffs' Complaint, the Village employed defendants. Amrich served as the mayor of the Village. Schnell was the former building commissioner for the Village, a part-time police officer for the Village, and Amrich's former campaign manager. Beeson was a trustee of the Village's board. While employed as police officers, plaintiffs Sciarrone (the Village's chief of police) and Dickerson allegedly found "circumstantial evidence of theft, bribery, and obstruction of justice" by defendants. Rivera was hired by Sciarrone and Dickerson as an investigator to "further investigate the circumstances uncovered." Plaintiffs then informed the McHenry County State's Attorney's office and Federal Bureau of Investigation (FBI) of the alleged information. According to plaintiffs, when defendants discovered that evidence of their alleged misconduct had been reported, they "entered upon a course of conduct designed to frustrate the investigation and/or retaliate against [p]laintiffs."

Plaintiffs were then "fired[,] even though they had been long-time, trusted employees of the Village whose competence and professionalism had never been questioned before."

¶ 4   As factual allegations common to all plaintiffs' claims, plaintiffs further alleged as follows. In January of 2018, Schnell applied to become a part-time police officer for the Village. A background investigation was conducted. Through the background investigation, Sciarrone discovered that Schnell previously worked as an officer for the Village. During the previous employment, Schnell was discovered to have been dishonest in his application by failing to disclose discipline during his time with the Chicago Police Department, Schnell's previous employer. Schnell resigned from the Village in 2010. Plaintiffs alleged that, in the spring of 2013, after Amrich became mayor of the Village, Schnell requested a review of the report leading to his 2010 resignation. A new report, allegedly based on false affidavits, was prepared that allowed Schnell to be reinstated as a part-time police officer for the Village and to perform the duties of building commissioner/code enforcement officer. Plaintiffs further investigated the relationship between Schnell, Amrich, and Beeson. As part of this investigation, Rivera was brought in as an extra investigator.

¶ 5   Plaintiffs alleged that their investigation uncovered wrongdoing by Village officials, which included improprieties related to Schnell's use of his Village vehicle, malfeasance by Schnell as code enforcement officer, and alleged violations of Village ordinances and misappropriation of Village property by Beeson. Plaintiffs alleged that they reported defendants to the McHenry County State's Attorney, "who began a criminal investigation of both Beeson and Schnell." Plaintiffs also met with the FBI, which "also opened a criminal investigation of the situation."

¶ 6   According to plaintiffs, once defendants learned of the investigation, "they entered upon a course of conduct designed to influence or obstruct the investigation and/or retaliate against

[p]laintiffs for having instituted it." In July of 2018, Rivera (and another officer not a part of the suit) wrote a memo to Amrich and a Village trustee, asking that they cease efforts to interfere with the investigation and protect them from retaliation. Plaintiffs alleged that, in August of 2018, the Village hired a law firm, Clark Baird Smith LLP (Clark), to investigate Sciarrone and Dickerson based on claims of harassment made by defendants. The investigation was documented in a written report (the Clark Report). Plaintiffs averred that this investigation was conducted with the goal of finding a reason to terminate their employment. On September 27, 2018, Sciarrone was placed on administrative leave by Amrich. On October 26, 2018, Sciarrone was advised that he had been terminated as of October 25, 2018, by the vote of the Village board and on the recommendation of Amrich. On January 18, 2019, Dickerson's employment as a Village police officer was terminated by the chief of police who replaced Sciarrone. In November of 2018, Rivera was informed that he could remain a part of the Village police force if he agreed "to walk a beat" on patrol, rather than remain an investigator. Later, Rivera resigned.

¶ 7    In their Complaint, plaintiffs sought reinstatement, back pay, and damages for violation of the Whistleblower Act (*id.* §§ 15, 20). Additionally, they alleged that the Village was liable for damages for the common law tort of retaliatory discharge. Defendants answered the Complaint and later filed separate motions for summary judgment against each plaintiff on all counts of the Complaint, which were granted by the trial court. Plaintiffs timely appealed.

¶ 8                                    II. ANALYSIS

¶ 9    Summary judgment is proper only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "The purpose of summary judgment is not to try a question of fact but, rather, to determine

whether a triable question of fact exists." *West Bend Mutual Insurance Co. v. TRRS Corp.*, 2022 IL App (2d) 210506, ¶ 13. A genuine issue of material fact precluding summary judgment exists where the parties either dispute the material facts or, if the facts are undisputed, reasonable persons might draw different inferences from them. *Id.* We review a grant of summary judgment *de novo*. *Id.* Further, summary judgment is a drastic means of disposing of litigation and should be entered only when the right of the moving party is clear and free from doubt. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993). A defendant moving for summary judgment must meet the initial burden of production by either affirmatively showing that some element of the case must be resolved in the defendant's favor or by showing the absence of evidence supporting the plaintiff's position on one or more elements of the cause of action. *Hutchcraft v. Independent Mechanical Industries, Inc.*, 312 Ill. App. 3d 351, 355 (2000). A plaintiff is not required to prove his or her case at the summary judgment stage; in order to survive a motion for summary judgment, the plaintiff must present a factual basis that would arguably entitle him or her to a judgment. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). When reviewing a motion for summary judgment, the trial court must construe documents and exhibits strictly against the moving party and liberally in favor of the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 10    In this matter, each motion for summary judgment will be analyzed individually. However, before we do that, common to all the motions is defendants' argument that plaintiffs have failed to set forth facts that, if proved, would entitle them to judgment. In their brief, defendants note that we are not limited to the "stated reasons" for the trial court's order; rather, we "can affirm the judgment of the trial court for any basis in the record." See *In re Estate of McDonald*, 2024 IL App (2d) 230195, ¶ 45 ("Further, we review the result at which the trial court arrived rather than

its reasoning and may affirm on any basis apparent in the record."). Therefore, defendants urge us to affirm the summary judgments, based upon the failure of plaintiffs to "put up" evidentiary facts to refute the motions, citing *Tafoya-Cruz v. Temperance Beer Co.*, 2020 IL App (1st) 190606, ¶ 68 ("Summary judgment ' "is the put up or shut up moment in a lawsuit." ' [Citation.]").

¶ 11　　However, this argument, presented in two scant pages of the defense brief, is woefully undeveloped and is forfeited. For example, defendants assert that their statement of facts is "replete with record evidence showing that Plaintiffs have no case"; yet, they make no effort to explain how *undisputed* material facts entitle them to judgment. They contend that Sciarrone and Dickerson were fired for cause, as set forth in the Clark Report, and that Rivera resigned because he did not want to work on patrol duty. But "[m]ere contentions, without argument or citation to authority, do not merit consideration on appeal." *People v. One Black 2016 Jeep Wrangler Unlimited*, 2025 IL App (2d) 240314, ¶ 42. Further, this argument overlooks deposition testimony by Sciarrone that the Clark Report was "a guise" to justify termination of him and Dickerson, as well as complaints by Rivera that he was the victim of retaliation. Thus, even if we were to accept defendants' assertions regarding the Clark Report, it would merely show a conflict of fact with plaintiffs' evidence. Moreover, this court is " ' "entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented ([210 Ill. 2d R. 341(h)(7)]), and it is not a repository into which an appellant may foist the burden of argument and research." ' [Citation.]" *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010).

¶ 12　　Forfeiture aside, before addressing this argument, we would be required to first examine whether defendants had met their initial burden of production on a summary judgment motion by either affirmatively showing that some element of the case must be resolved in defendants' favor or by showing the absence of evidence supporting plaintiffs' position on one or more elements of

the cause of action. *Hutchcraft*, 312 Ill. App. 3d at 355 ("[O]nce [a] defendant has satisfied its initial burden of production, the burden shifts to [the] plaintiff to present some factual basis that would arguably entitle her to a judgment under the applicable law."). To this end, we note that Nineteenth Judicial Circuit Court Rule 2-1.04(A)(3) (Dec. 31, 2017) provides that summary judgment motions be served and filed with a "statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a Judgment as a matter of law." The rule describes the statement of material facts as "consist[ing] of short numbered paragraphs" of uncontroverted facts with citation to their foundation in the record. 19th Judicial Cir. Ct. R. 2-1.04(A) (Dec. 31, 2017).

¶ 13   The rule goes on to require the opponent to the summary judgment motion to file and serve a concise response to each numbered paragraph in the movant's statement of material facts. 19th Judicial Cir. Ct. R. 2-1.04(B)(3)(a) (Dec. 31, 2017). The rule pronounces that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." 19th Judicial Cir. Ct. R. 2-1.04(B)(3)(b) (Dec. 31, 2017) (providing, also, procedure for the opponent to present additional facts that would require the denial of the motion).

¶ 14   Unfortunately, defendants' motions failed to even gesture towards compliance with the local rule. See 19th Judicial Cir. Ct. R. 2-1.04 (Dec. 31, 2017). It is true that none of the material was objected to by plaintiffs and that some of the material was partial depositions of plaintiffs, public records or ordinances, and correspondence or other material that was or could have been easily rendered sufficient for consideration in summary judgment proceedings. See generally *Enbridge Pipeline (Illinois), LLC v. Kiefer*, 2017 IL App (4th) 150342, ¶ 43; *Essig v. Advocate BroMenn Medical Center*, 2015 IL App (4th) 140546, ¶ 49; *Evans v. Brown*, 399 Ill. App. 3d 238

(2010) (discussing the proper procedures for factual predication of summary judgment). But, as Justice Steigmann noted in *Essig*,

> "[O]n review of a trial court's summary judgment determination, we are to perform the appropriate analysis *de novo*, without deferring to the trial court's judgment or reasoning. [Citation.] Indeed, even in the absence of an objection, the appropriate summary judgment analysis usually requires the court to first identify the evidence that should be considered."
>
> *Essig*, 2015 IL App (4th) 140546, ¶ 54.

*Cf.* 19th Judicial Cir. Ct. R. 2-1.04(A) (Dec. 31, 2017) ("Failure to submit [a statement of material facts] constitutes grounds for denial or striking of the Motion.").

¶ 15 Defendants' argument that summary judgment is proper regarding Sciarrone and Dickerson depends upon the damning nature of the Clark Report as the true cause for their terminations. But simply fastening the report to the motion does not render it cognizable as evidence in a motion for summary judgment. See *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 648 (2002) (citing *Safeway Insurance Co. v. Hister*, 304 Ill. App. 3d 687, 691 (1999) ("evidence that would be inadmissible at trial may not be considered in support of or in opposition to a motion for summary judgment")). The report is unsworn and, in the form submitted, could not meet the strict requirements of either the summary judgment statute (735 ILCS 5/2-1005 (West 2022)) or Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013). See *Essig*, 2015 IL App (4th) 140546, ¶¶ 47-49 (holding a written report of expert may not be considered for summary judgment because not in form of sworn affidavit). The Clark Report is "entirely insufficient" (*id.* ¶ 43) as a factual predicate for summary judgment and not a proper basis for this court to consider as an alternative ground for affirmance as to Sciarrone and Dickerson.

¶ 16    As to Rivera, defendants argued in their motion that his motive in resigning was unrelated to the alleged retaliation. But, as the court observed in *Kornick v. Goodman*, 2023 IL App (2d) 220197, ¶ 23, "we have repeatedly held that ' " 'summary judgment is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent[,] and subjective feelings and reactions.' " ' [Citation.]." See *Hubert v. Board of Education of Chicago*, 2020 IL App (1st) 190790, ¶¶ 25, 36 (reversing summary judgment granted where defendant argued that insubordination was the reason for plaintiff's termination but plaintiff argued the reason was whistleblowing). For these reasons, we decline defendants' invitation to affirm on this alternative basis.

¶ 17                    A. The Motion Against Plaintiff Sciarrone

¶ 18                              1. Background

¶ 19    In defendants' motion for summary judgment against Sciarrone, who was the police chief, defendants stated that, pursuant to village ordinance, the chief of police was appointed by the mayor with the advice and consent of the Village board and served at the discretion of both. Defendants pointed out that Sciarrone was voted out of the office of chief of police by a majority of the Village board. Defendants initially argued that Amrich and Beeson were not the proper defendants, as they were not employers pursuant to the Whistleblower Act, and that because they were members of a legislative body, they were not personally liable for their legislative acts. Further, defendants argued that Sciarrone was properly terminated by the Village board of trustees, based upon the findings of the Clark Report. The trial court denied defendants' motion for summary judgment against Sciarrone. However, defendants filed a motion for reconsideration.

¶ 20    In the motion to reconsider, defendants stated that when

"discussing the concept that members of a municipal body are not personally liable for their legislative acts, the Court brought up for the first time, the issue if one of the legislators *** had an ulterior motive in voting the way they did, Plaintiff[s] could argue [that the legislator] should have recused himself from the vote and that would have changed the voting totals."

In their motion to reconsider, defendants argued that a legislator's motivation is irrelevant to this analysis, citing *Arizona v. California*, 283 U.S. 423, 455 (1931) ("It is not consonant with our scheme of government for a court to inquire into the motives of legislators."). Further, defendants argued, *inter alia*, that "absolute immunity shields a legislator's conduct even when that conduct is based on improper motives."

¶ 21    On January 31, 2024, the trial court entered an order allowing the motion to reconsider and granting defendants' motion for summary judgment in their favor and against Sciarrone. A subsequent order clarified that the trial court granted summary judgment because "the discharge of [Sciarrone] by the Village of Island Lake occurred through a legislative act which is absolutely immune under the law."

¶ 22                    2. Arguments—Legislative Immunity

¶ 23    Having already rejected defendants' proposed alternative basis for affirmance—that plaintiffs' response to the motion was ineffectual and that the Clark Report established sufficient cause—we will now address Sciarrone's argument on appeal that the trial court erred in granting defendants' motion for summary judgment as to his Complaint on the basis that defendants were entitled to legislative immunity. Sciarrone raises three arguments: (1) the Village, as opposed to individual legislators, is not immune, citing *Buraglio v. Village of Wapella*, No. 13-3092, 2014

WL 2809012 (C.D. Ill. June 19, 2014), and *Redwood v. Lierman*, 331 Ill. App. 3d 1073 (2002); (2) neither the Village nor the individual legislators are protected because the act of firing an employee is administrative versus legislative and therefore not entitled to legislative immunity; and (3) the plain language of the Whistleblower Act imposes liability despite otherwise applicable immunity, based upon its broad definition of employer, which includes "a unit of local government." 740 ILCS 174/5 (West 2018).

¶ 24 This third argument is raised in the opening brief, in one short, elliptical paragraph that is devoid of any reasoning or citation to authority, even to the Whistleblower Act (which is discussed but never actually cited). We point out that Illinois Supreme Court Rule 341(h)(5) (eff. Oct. 1, 2020) requires that, in any case requiring the construction or validity of a statute, the brief should set off, in a section entitled "Statutes Involved," the pertinent parts of the statute verbatim, and, of course, its citation. We could strike the brief or dismiss the appeal (*Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 9), but, in our discretion, choose to address the merits, noting that the reply brief does more adequately address the issue. See *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 17. We do remind appellants that supreme court rules should be followed. *Epstein v. Davis*, 2017 IL App (1st) 170605, ¶ 22.

¶ 25 Defendants maintain that the Local Governmental and Governmental Employees Tort Immunity Act (Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2018)), provides "clear immunity" to all defendants, pointing to several provisions of the Immunity Act. They also cite Illinois case law that has recognized legislative or other immunity in similar settings. Finally, they dispute Sciarrone's argument that the Whistleblower Act should be construed to contravene the Immunity Act. Neither side consistently applies their immunity analysis separately to the distinct

theories of liability in the Complaint, but we will do so, first addressing the common law retaliatory discharge count and then the count under the Whistleblower Act.

¶ 26                                a. Retaliatory Discharge

¶ 27    First, we will analyze whether and to what extent there is immunity for legislative acts that form the basis of a common law retaliatory discharge claim. Retaliatory discharge was first recognized as a cause of action by the Illinois Supreme Court in 1978 in *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978). The *Kelsay* court held that, despite the at-will employment rule in Illinois (*id.* at 181), a plaintiff who was terminated for pursuing workers' compensation benefits could bring an action for retaliatory discharge against her former employer. *Id.* at 184-85. However, the action may be maintained only against the employer, not its agents or employees. *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 17-21 (1998) (collecting cases and noting the " 'guarded development and narrow construction' " of the cause of action (quoting *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 45 (1994) (plurality opinion)).

¶ 28    In this count, only the Village is named as a defendant. Sciarrone contends that the Village is not immune, based on the holdings of *Buraglio*, 2014 WL 2809012, and *Redwood*, 331 Ill. App. 3d 1073. He also argues that because the act of the Village in firing an employee is an administrative and not a legislative act, it is not protected by legislative immunity.

¶ 29    Legislative immunity is well recognized in both state and federal law. The Supreme Court observed, in *United States v. Johnson*, 383 U.S. 169, 179 (1966), that "[i]n part because the tradition of legislative privilege is so well established in our polity, there is very little judicial illumination of [the Speech or Debate Clause (U.S. Const., art. I, § 6)]," from which legislative immunity emanates. See Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113, 1121 (1973) ("the literal language of the speech

or debate clause is thus construed to include voting, committee hearings, and legislative debate"). "In Illinois, legislative immunity is addressed in article IV, section 12, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 12) and section 107-7 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-7 (West 2000))." *Jorgensen v. Blagojevich*, 211 Ill. 2d 286, 309-10 (2004) (finding the doctrine inapplicable to suit regarding constitutionality of gubernatorial veto of legislation affecting judicial salaries and rejecting relevance of federal precedents).

¶ 30    The common law of this state recognized a similar privilege. The Illinois Supreme Court has stated: "Traditionally, the members of legislative and judicial bodies have been accorded absolute privilege in the performance of their official acts and duties." *Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Ass'n*, 37 Ill. 2d 546, 549 (1967) (citing *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) ("Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good.")). The court applied the rule in *Pechous v. Slawko*, 64 Ill. 2d 576, 592 (1976), where mayors, who successfully challenged the validity of ordinances passed by their local legislative bodies, were granted their attorney fees by the trial court. Although the *Pechous* court "agree[d] with the plaintiffs that this litigation was brought about by the illegal conduct of the individual members of the two legislative bodies," the court reversed the fee awards based on legislative immunity. *Id.* at 592-93. The court ruled: "[T]he considerations that have supported the 'elementary rule' that members of a municipal legislative body are not personally liable for their legislative acts (see 56 Am. Jur. 2d *Municipal Corporations* sec. 146) remain applicable here." *Id.* at 593.

¶ 31    In addition to the common law of Illinois, the Immunity Act affords legislative immunity to local public entities, as well as local legislators. Section 2-103 of the Immunity Act provides:

"A local public entity is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." 745 ILCS 10/2-103 (West 2018). In similar terms, public employees (which includes officers and board members) (*id.* § 1-202) are also granted immunity. *Id.* § 2-205.

¶ 32     But, although we have discussed the common law on this topic for historical reasons and because the parties have argued it, we take care to acknowledge that the Immunity Act supplants common law immunity doctrines. In *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 486 (2001), our supreme court held that where the Immunity Act provided an absolute defense for a governmental unit, the court would not engraft a common law exception to negate that immunity. In *Bloomingdale*, a developer, aggrieved over the municipality's denial of a petition for annexation, claimed the municipality was liable for, *inter alia*, tortious interference with business expectancy. *Id.* The municipality raised the defense of sovereign immunity, pointing to various provisions of the Immunity Act, including the legislative immunity provisions, and the trial court dismissed. *Id.* at 488. The appellate court reversed, holding that the general grants of immunity in the Immunity Act were limited by the common law exception for "corrupt or malicious motives." *Id.*

¶ 33     The supreme court disagreed. *Id.* at 499-500. It noted that after its abolition of sovereign immunity in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959), the legislature responded with the Immunity Act in 1965. *Bloomingdale*, 196 Ill. 2d at 489. The court pointed out that the Immunity Act acknowledged the general principle of municipal liability in tort but limited that liability with "an extensive list of immunities based on specific government functions." *Id.* Then in 1970, the new state constitution enshrined the abolition of sovereign immunity, but with the proviso, "[e]xcept as the General Assembly may provide by law." Ill.

Const. 1970, art. XIII, § 4; *Bloomingdale*, 196 Ill. 2d at 489. From this history, the court concluded: "Today, therefore, the tort liability of a local public entity or employee is expressly controlled both by the constitutional provision and by legislative prerogative as embodied in the Tort Immunity Act." *Id.*

¶ 34　Explaining further, the court rejected the notion that common law exceptions would abridge the immunities granted in the Immunity Act: "[W]e may refer to the common law to determine the duties a local public entity holds. But to determine whether that entity is liable for the breach of a duty, we look to the Tort Immunity Act, not the common law." *Id.* at 490. Because the plain language of the Immunity Act did not contain an exception for "corrupt or malicious motives," the court refused to insert one: "[W]e would be venturing into the province of the legislature and violating the separation of powers." *Id.* at 494.

¶ 35　Turning to Sciarrone's arguments applicable to this retaliatory discharge count, Sciarrone first contends the Village is not immune, pointing to the holdings of *Buraglio*, 2014 WL 2809012, and *Redwood*, 331 Ill. App. 3d 1073. Neither of these cases supports Sciarrone's position. *Buraglio* is an unpublished federal district court opinion. The plaintiff in that case claimed the Village of Wapella violated her constitutional rights, tortiously retaliated against her with respect to the discharge of her duties as treasurer, and also contravened the Whistleblower Act. *Buraglio*, 2014 WL 2809012, at *1. As the case relates to retaliatory discharge, the court granted the motion to dismiss because the timing of the alleged retaliatory discharge made it impossible for the plaintiff to "plausibly allege" that she was terminated for reasons that would support her tort claim. *Id.* at *7. Therefore, *Buraglio* never discussed legislative immunity as it pertained to the state common law claim of retaliatory discharge, and Sciarrone's argument can find no foundation there.

Moreover, the *Buraglio* court's comment in a footnote about legislative immunity is informed by federal common law on the topic (*id.* at *10 n.2.), which is irrelevant to our analysis.

¶ 36     *Redwood* involved claims brought under section 1983 of the Civil Rights Act of 1871 (42 U.S.C. § 1983 (1994)), arising out of a municipality's entry into a homeowner's yard to tow an allegedly inoperable vehicle. *Redwood*, 331 Ill. App. 3d at 1076-79. *Redwood* was construing federal law on a federal claim and applied federal court rulings in finding that the municipality was not afforded legislative immunity. Nevertheless, the *Redwood* court determined that the village attorney, who drafted the village ordinance that assertedly violated the plaintiff's rights, was protected. *Id.* at 1088.

¶ 37     But the action now before us is a retaliatory discharge claim under our common law. And because *Bloomingdale*, 196 Ill. 2d at 490, requires this court to look solely to the Immunity Act and not the common law (and certainly not federal common law) to determine the protection provided municipal defendants, these cases just do not apply. See *Schlicher v. Board of Fire & Police Commissioners of Westmont*, 363 Ill. App. 3d 869, 876-79 (2006) (applying the Immunity Act's legislative immunity provisions to defeat a state tort claim and federal case law on legislative immunity to defeat a section 1983 claim). Under the plain language of the Immunity Act, both the local public entity (745 ILCS 10/2-103 (West 2018)) and its legislators (*id.* § 2-205) enjoy absolute immunity for injuries caused by adopting an enactment. *Carter v. City of Elmwood*, 162 Ill. App. 3d 235, 237 (1987) (holding as a matter of first impression that the Immunity Act's "clear and unequivocal" provision shielded public employees from liability for retaliatory discharge due to their legislative acts); *cf. Schlicher*, 363 Ill. App. 3d at 877-78 (refusing to find an exception to the Immunity Act's broad protection for legislative activities for willful and wanton conduct).

¶ 38 *Bloomingdale* also dooms Sciarrone's argument that legislative immunity does not protect administrative, as opposed to legislative, acts. Citing *Bagley v. Blagojevich*, 646 F.3d 378 (7th Cir. 2011), *McBride v. McLean County*, 397 F. Supp. 3d 1198, 1207-08 (C.D. Ill. 2019) (holding that county administrator was immune where ordinance implemented a broad policy decision to reduce work force based on budgetary concerns), and *Baird v. Board of Education for Warren Community Unit School District No. 205*, 389 F.3d 685, 696 (7th Cir. 2004) (finding board that fired school superintendent did not enjoy legislative immunity because "termination of an employee *** is an administrative act"), plaintiff contends that the act of discharging him by ordinance was not legislative in character.

¶ 39 *Bagley* illustrates the theory. In that case, the court decided that the governor was shielded from deposition by legislative immunity in litigation under a federal claim pursuant to section 1983, brought by employees whose positions were eliminated in budget legislation. *Bagley*, 646 F.3d at 391-96. But in granting immunity, *Bagley* acknowledged that federal "precedent supports the distinction between the firing of an employee and the elimination of a position" in legislation (*id.* at 393), with the former being considered administrative, and not action " 'taken in the sphere of legitimate legislative activity.' " *Id.* at 393-94 (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998)). But again, this is a state tort claim, and the federal common law is not relevant to immunity. See *Bloomingdale*, 196 Ill. 2d at 490. No distinction is expressed in the Immunity Act between legislative and administrative acts. See 745 ILCS 10/2-103 (West 2018). Like the exception at issue in *Bloomingdale*, 196 Ill. 2d at 490, 494, we cannot engraft an exception for administrative acts onto the Immunity Act's plain language. Therefore, the trial court properly found legislative immunity shielded the Village from liability for retaliatory discharge and granted summary judgment in the Village's favor.

¶ 40                    b. Illinois Whistleblower Act

¶ 41    We now turn to our analysis of whether legislative immunity also applies to Sciarrone's cause of action brought under the Whistleblower Act. In his reply, Sciarrone observes that the Whistleblower Act and the Immunity Act are "in tension," and argues that the more specific statute (the Whistleblower Act) should control over the more general statute (the Immunity Act). The defense calls the notion that the Whistleblower Act could take priority over the Immunity Act "wild" and "frivolous," although it does not undertake any further analysis of the claim under the Whistleblower Act.

¶ 42    The Whistleblower Act broadly prohibits "[a]n employer" from taking retaliatory action against an employee for disclosing information to law enforcement regarding an activity of the employer that violates a law, rule, or regulation. 740 ILCS 174/15 (West 2018). See generally Amelia Buragas & Pete Sherman, *To Whistle While You Work*, 113 Ill. Bar J. 10 (Apr. 2025). The definition of "employer" within the Whistleblower Act is sweeping in scope and specifically includes:

> "[A] political subdivision of the State; *a unit of local government*; a school district, combination of school districts, or governing body of a joint agreement of any type formed by two or more school districts; a community college district, State college or university, or any State agency whose major function is providing educational services; any authority including a department, division, bureau, board, commission, or other agency of these entities; and *any person acting within the scope of his or her authority express or implied on behalf of those entities* in dealing with its employees." (Emphases added.) 740 ILCS 174/5 (West 2018).

Thus, by its plain terms, the Whistleblower Act includes local public entities and their employees as potential defendants.

¶ 43    On the other hand, as discussed above, the Immunity Act's plain language protects both local public entities (745 ILCS 10/2-103 (West 2018)) and its legislators (*id.* § 2-205) from liability for injuries caused by adopting an enactment. In the Immunity Act, "injury" includes any injury in any civil action including those based upon "the statutes *** of Illinois." *Id.* § 1-204.

¶ 44    The issue here is which statute controls. In deciding the matter, we are cognizant that "the cardinal rule of interpreting statutes, to which all other canons and rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature." *Martin v. Goodrich Corp.*, 2025 IL 130509, ¶ 43. When the language is unambiguous, the statute must be applied as written, without resorting to other aids of construction. *Lawrence v. Regent Realty Group, Inc.*, 197 Ill. 2d 1, 10 (2001). But where two statutes appear to conflict, our supreme court has held that the court must resort to other means than application of the plain, ordinary, and popular meaning of the language in determining the legislature's intent. *Moore v. Green*, 219 Ill. 2d 470, 479 (2006).

¶ 45    *Moore* instructs that where two statutes conflict, the court should attempt to construe them together, *in pari materia*, where reasonable. *Id.* Further, as plaintiff alluded, where a more general statute and a more specific statute relate to the same subject matter, courts will presume that the legislature intended the more specific provision to govern. *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002). Additionally, it is presumed that the more recent statutory provision was intended by the legislature to control. *State of Illinois v. Mikusch*, 138 Ill. 2d 242, 254 (1990).

¶ 46    It should be noted that the very provision of the Whistleblower Act that now sweeps local public entities into its purview originally excepted them. The Whistleblower Act, as initially adopted, excluded "governmental entit[ies]" from the definition of "employers." Pub. Act 93-544,

§ 5 (eff. Jan. 1, 2004) ("except that 'employer' does not include any governmental entity"); 740 ILCS 174/5 (West 2004). The definition of "employer" was amended in 2008 to include a list of governing bodies and school districts. Pub. Act 95-128 (eff. Jan. 1, 2008) (amending 740 ILCS 174/5); 740 ILCS 174/5 (West 2018). That enactment also limited the effect of home rule powers with respect to, *inter alia*, the Whistleblower Act. Pub. Act 95-128 (eff. Jan. 1, 2008) (adding 740 ILCS 174/40) ("the provisions of this [Whistleblower] Act are the exclusive exercise by the State of powers and functions which might otherwise be exercised by other home rule units"); 740 ILCS 174/40 (West 2018). It seems clear that the legislature took up amending a statute that was in harmony with the Immunity Act, and crafted a statute that deliberately scuttled that immunity.

¶ 47    If there were any doubt of this intent, we would be reassured in our conclusion by the statement of the bill's Senate sponsor, Senator Frerichs, who told the chamber: "Thank you, Mr. President. House Bill 742 expands whistleblower protections to educational employees and local governments. It prohibits retaliation against employees who disclose information to a court, administrative hearing, or any other proceeding. And this preempts home rule. I would ask a favorable vote." 95th Ill. Gen. Assem., Senate Proceeding, May 16, 2007, at 104 (statements of Senator Frerichs).

¶ 48    As noted, our state's constitution vests the legislature with the authority to regulate governmental immunities. *Bloomingdale*, 196 Ill. 2d at 489. It is not much of a leap to conclude it can also impose liability where there would otherwise be none. Given that the Whistleblower Act's amendment in 2007 occurred well after the Immunity Act was adopted in 1965 (see *id.*), we must conclude that the legislative prerogative was intentionally exercised to relinquish immunity for local public entities within the specific sphere of violations of the Whistleblower Act. See *Mikusch*, 138 Ill. 2d at 254 ("When two statutes appear to be in conflict, the one which was enacted later

should prevail."). Further, to the extent the Immunity Act and the Whistleblower Act are in conflict, the more specific Whistleblower Act would control actions that lie within its scope. See *Knolls Condominium Ass'n*, 202 Ill. 2d at 459. We hold that the Whistleblower Act's imposition of liability upon local public entities, therefore, controls over the Immunity Act's grant of immunity. Summary judgment in favor of the Village regarding Sciarrone's claim pursuant to the Whistleblower Act was error.

¶ 49     That leaves consideration of whether the trial court's grant of summary judgment on this count on the basis of legislative immunity in favor of the individual defendants was also erroneous. Our analysis is similar. The Immunity Act would provide immunity for those who voted on an ordinance (745 ILCS 10/2-205 (West 2018)) unless a provision of the Whistleblower Act predominates. Here, the Whistleblower Act does impose liability on persons other than the employer. The Whistleblower Act defines "employer" to include "any person acting within the scope of his or her authority express or implied on behalf of those entities in dealing with its employees." 740 ILCS 174/5 (West 2018). That language would include the individual defendants, Amrich and Beeson. Because the Whistleblower Act controls, the Immunity Act does not protect them, and the trial court erred in granting summary judgment on this basis to the individual defendants.

¶ 50                         c. Conclusion as to Sciarrone's Claims

¶ 51     In conclusion, the legislature, and not the common law, is the sole authority on legislative immunity. Thus, the trial court did not err in granting summary judgment to the Village on the common law retaliatory-discharge claim because the Immunity Act shields local public entities (745 ILCS 10/2-103 (West 2018)) for legislative acts. But, in amending the Whistleblower Act to include local public entities as employers, the legislature clearly intended to expose local public

entities—and persons acting within the scope of their employment on behalf of local public entities—to liability for claims of unlawful retaliation under the Whistleblower Act. Therefore, there is no legislative immunity available for the claim under the Whistleblower Act, and the trial court erred in granting defendants summary judgment on that basis.

¶ 52                              B. The Motion Against Plaintiff Dickerson

¶ 53     We will now address the issues pertaining to plaintiff Dickerson (as defendants' assertion of *res judicata* is dispositive, we limit our analysis to this issue). The trial court granted a defense motion for summary judgment, in which defendants argued that Dickerson's claims were barred by the doctrine of *res judicata* as a result of an arbitration hearing that took place in 2019. Defendants' motion asserted that Dickerson was terminated as a result of disciplinary action by the chief of police, and Dickerson, pursuant to a collective bargaining agreement (CBA), sought arbitration. At the arbitration hearing, the arbitrator sustained 10 allegations of misconduct against Dickerson and found that there was "just cause" for Dickerson's termination. Thus, defendants argued, in accordance with the arbitrator's findings, that the termination was not related to Dickerson's involvement in the investigation of the trustees, as alleged in plaintiffs' Complaint.

¶ 54     At the arbitration hearing, Dickerson, by a labor council representative, contested the factual basis of the allegations against him. Further, the arbitrator noted that Dickerson raised an additional issue:

> "Here, the [Fraternal Order of Police (FOP)] submits that an interesting aspect of this case, which has not really been touched upon, is that Officer Dickerson was targeted by certain members of the Village Board in an effort to suppress an ongoing criminal investigation into at least two of the trustees. Taking part in this investigation was Sergeant Billy Dickerson, as well as former Police Chief Sciarrone and two part time employees,

Chick [*sic*] Mader and Joe Rivera. [Citation.] After efforts were made to convince Chief Sciarrone to end this investigation failed [*sic*], all four were summarily fired, including Officer Dickerson in his role in this investigation and possible corruption into the Village [*sic*]. FOP Counsel argues that the Village had conducted an investigation and has slapped 'trumped-up' charges against him [Citation.]."

Accordingly, the arbitrator continued, Dickerson asserted that "each of the charges against [him] are retaliatory and without merit." Thus, Dickerson interposed the facts underlying the claims raised in this matter as a defense to the various allegations that the Village asserted as cause for his discharge. As such, the allegation that Dickerson's discharge was retaliation was presented to the arbitrator, albeit as a defense rather than as an independent claim.

¶ 55    Defendants now argue that the arbitration proceeding is *res judicata* as to Dickerson's current claims. The doctrine of *res judicata* holds that "a final judgment rendered on the merits by a court of competent jurisdiction is conclusive as to the rights of the parties and their privies and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action." *Torcasso v. Standard Outdoor Sales, Inc.*, 157 Ill. 2d 484, 490 (1993). A party asserting a defense of *res judicata* must show "(1) that a court of competent jurisdiction rendered a final judgment on the merits; (2) that there is an identity of the parties or their privies; and (3) that there is an identity of cause of action." *Cload v. West*, 328 Ill. App. 3d 946, 949-50 (2002). The burden of showing *res judicata* applies is on the party asserting it. *Board of Education of Sunset Ridge School District No. 29 v. Village of Northbrook*, 295 Ill. App. 3d 909, 915 (1998). *Res judicata* "bars not only all claims actually resolved in the former suit, but also any claims that could have been raised." *Kasny v. Coonen & Roth, Ltd.*, 395 Ill. App. 3d 870, 873 (2009); see *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 76 ("*Res judicata* embraces all grounds of

recovery *and defense* involved and which might have been raised in the first action." (Emphasis added.)). Whether *res judicata* bars a claim presents a question of law subject to *de novo* review. *Agolf, LLC v. Village of Arlington Heights*, 409 Ill. App. 3d 211, 218 (2011).

¶ 56    At issue here is the third element of a *res judicata* claim. Regarding the first element, which is not contested here, arbitration judgments generally "have the same *res judicata* and collateral estoppel effect as court judgments." *Taylor v. Peoples Gas Light & Coke Co.*, 275 Ill. App. 3d 655, 661 (1995); see *Village of Bartonville*, 2017 IL 120643, ¶ 71 ("Administrative decisions have *res judicata* and collateral estoppel effect where the administrative determination is made in proceedings that are adjudicatory, judicial, or quasijudicial in nature."). Moreover, as Dickerson did not appeal the arbitrator's decision, it was a final judgment in accordance with the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2022)). As to the second element, it is undisputed that the arbitration and the subsequent retaliatory discharge action involve the same parties or their privies. Thus, we are left to determine whether there is an identity of causes of action between the arbitration and Dickerson's claim that his discharge resulted from retaliation for reporting criminal activity of the Village board.

¶ 57    In determining whether an identity of causes of action between a current and an earlier case exists, Illinois courts employ the transactional test. *Turczak v. First American Bank*, 2013 IL App (1st) 121964, ¶ 24. In 1998, our supreme court adopted the transactional test in *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 310-11 (1998), and abandoned the formerly controlling same-evidence test. Pursuant to the same-evidence test, an identity of causes of action existed where " 'the evidence needed to sustain the second suit would have sustained the first, or if the same facts were essential to maintain both actions.' " *Id.* at 307 (quoting *Rodgers v. St. Mary's Hospital*, 149 Ill. 2d 302, 312 (1992)). "[U]nder the same evidence test the definition of what

constitutes a cause of action is narrower than under the transactional test." *Id.* at 309. The supreme court noted:

> "As explained in the Restatement (Second) of Judgments, the same evidence test is tied to the theories of relief asserted by a plaintiff, the result of which is that two claims may be part of the same transaction, yet be considered separate causes of action because the evidence needed to support the theories on which they are based differs. Restatement (Second) of Judgments § 24, Comment a, at 197 (1982). By contrast, the transactional approach is more pragmatic. Under this approach, a claim is viewed in 'factual terms' and considered 'coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; *** and regardless of the variations in the evidence needed to support the theories or rights.' Restatement (Second) of Judgments § 24, Comment a, at 197 (1982)." *Id.*

¶ 58     On the other hand, pursuant to the transactional test, "separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *Id.* at 311. "[T]he assertion of different theories or kinds of relief still constitutes a single cause of action if a single group of operative facts gives rise to the assertion of relief." *Village of Bartonville*, 2017 IL 120643, ¶ 50. "Under the transactional test, a valid final judgment bars further action by the plaintiff regarding any part of a transaction or series of connected transactions from which the claim arose." *Altair Corp. v. Grand Premier Trust & Investment, Inc.*, 318 Ill. App. 3d 57, 61 (2000). Thus, Illinois now applies the "more liberal transactional test." *Id.* We note that some cases cited by the parties predate the adoption of the transactional test and hence must be read in light of this change in the law.

¶ 59 We now turn to the question of whether an identity of causes of action exists between the claims asserted in the current proceeding and those raised in the earlier arbitration. In a case we find instructive, *Chicago Board of Education v. Chicago Teachers Union, Local No. 1*, 2024 IL App (1st) 240613, ¶¶ 28-35, the reviewing court applied the transactional test and found *res judicata* defeated a subsequent claim. That case involved the discipline of two teachers against whom the Chicago Board of Education filed dismissal charges. *Id.* ¶¶ 2, 6. After an evidentiary hearing, a hearing officer recommended that neither be dismissed, and the board agreed in part, retaining the teachers but imposing alternative sanctions, *i.e.*, suspensions without pay. *Id.* Both teachers petitioned for administrative review in the court. *Id.* ¶¶ 3, 7.

¶ 60 Meanwhile, the union representing the teachers filed grievances under the parties' collective bargaining agreement, contesting the authority of the board generally to impose alternative sanctions. *Id.* ¶¶ 4, 8. After the court cases were resolved in the board's favor (*id.* ¶¶ 5, 9), the board refused to continue arbitration with the Union, ultimately arguing *res judicata*. *Id.* ¶ 13. After an adverse ruling by the Illinois Educational Labor Relations Board, the board brought an administrative appeal to the appellate court. *Id.* ¶ 15.

¶ 61 On appeal, the issue was whether the grievance was barred by *res judicata*, based on the earlier administrative proceedings that resulted in the alternative sanctions. *Id.* ¶ 16. Considering whether an identity of causes of action existed, the court acknowledged the union's argument that the grievance was addressed to the board's authority to issue a suspension without pay generally rather than to the merits of either teachers' particular suspension. *Id.* ¶ 31. The court found this irrelevant: "[T]hat the Union may be challenging the [board's] suspension power in the course of contesting the Teachers' suspensions does not negate the fact that the grievances specifically and solely relate to reversing the Teachers' respective suspensions." *Id.* Writing for the court, Justice

Hoffman found it "quite clear that the same transaction forms the basis of both proceedings," explaining "[t]he assertion of different legal theories does not change the fact that the proceedings stem from the same transaction." *Id.* ¶ 30. Similarly, in this case, that the arbitration and the litigation involve different legal theories does not alter the fact that they both arose from the Village's decision to terminate Dickerson. See *Village of Bartonville*, 2017 IL 120643, ¶ 75 (holding identity of causes of action existed between action to terminate police officer's employment and union grievance because both sought to defend officer from "misconduct charges and to prevent his termination"). The operative fact in *Chicago Board of Education*, 2024 IL App (1st) 240613, ¶ 30, was that both actions arose from the board's decision to suspend the two teachers; similarly, here, both actions relate to Dickerson's termination.

¶ 62 We also find support in *Dookeran v. County of Cook*, 2013 IL App (1st) 111095, where the plaintiff, a doctor, was denied reappointment to the staff of Stroger Hospital by the Cook County Board. This denial was based on the allegation that the plaintiff "willfully failed to disclose a letter of reprimand he had received while employed at Mercy Hospital, in Pittsburgh and that he had a history of verbally abusing hospital personnel." *Id.* ¶ 4. The plaintiff sought judicial review of the board's decision. *Id.* ¶ 6. The trial court found that the sanction imposed was too harsh and remanded the case to the board for the imposition of a 30-day suspension. *Id.* On review, the First District reversed and reinstated the board's original decision. *Id.* While administrative review was pending, the plaintiff filed a complaint in the trial court, alleging, *inter alia*, retaliatory discharge. *Id.* ¶ 8. Count I alleged "that the County terminated his employment at Stroger Hospital in retaliation for his reporting of serious problems in the hospital's surgical residency program to his immediate superior and his reporting of inappropriate research and unethical practice of medicine

in the surgical department." *Id.* ¶ 9. The trial court granted a motion for summary judgment, finding that *res judicata* barred the plaintiff's civil lawsuit.

¶ 63       The appellate court affirmed, applying the transactional test and finding that the

> " 'single group of operative facts common to both' [actions] *** is that the denial of [the
>
> doctor's] reappointment to the Stroger medical staff was the result of an investigation into
>
> allegations that he failed to disclose prior disciplinary action taken against him and that he
>
> was verbally abusive to residents and other staff members." *Id.* ¶ 33.

The court later explained, "Both actions involved the same issue: whether the denial of the plaintiff's reappointment to the Stroger staff was proper." *Id.* ¶ 37. The *Dookeran* court also noted the limited precedential value of authority decided before the supreme court's adoption of the transactional test in *River Park, Inc.*, 184 Ill. 2d at 310-11. *Dookeran*, 2013 IL App (1st) 111095, ¶ 37 (rejecting plaintiff's reliance on *Kennedy v. Four Boys Labor Service, Inc.*, 276 Ill. App. 3d 248 (1995), where *res judicata* was not found because the prior action was based upon a different theory of liability with different elements of proof). Finally, *Dookeran* observed that "the plaintiff here failed to raise his retaliatory discharge and breach of contract claims at any time during the administrative review proceedings as required under the transactional test." *Id.* ¶ 35. Here, of course, Dickerson actually did raise the retaliation he claims to have suffered as a defense. In any event, as in *Dookeran*, in this case both claims arose from a single group of operative facts.

¶ 64       This brings us to the cases cited by Dickerson, which, like *Kennedy*, predate *River Park*. He cites *Beckman v. Freeman United Coal Mining Co.*, 123 Ill. 2d 281 (1988), and *Gonzalez v. Prestress Engineering Corp.*, 115 Ill. 2d 1 (1986), for the proposition that retaliatory discharge claims are not barred by a previous arbitration judgment against the discharged employee on the basis of *res judicata*. *Beckman* addressed the issue summarily, merely stating, "In this case, this

court finds that *res judicata* does not apply *** based on the decision in [*Gonzalez*, 115 Ill. 2d 1] and instead finds that plaintiff has failed to state a cause of action." *Beckman*, 123 Ill. 2d at 286. Parenthetically, we do note that, unlike the instant case where Dickerson raised retaliation as a defense, in *Beckman*, the "plaintiff had not placed the issue of retaliatory discharge before the industrial arbitrator." *Id.*

¶ 65    In any event, to understand why the *Beckman* court determined *res judicata* did not apply, we must examine *Gonzalez. Gonzalez* does not mention the term "*res judicata*" and instead involved federal preemption and exhaustion of remedies. *Gonzalez*, 115 Ill. 2d at 4. *Gonzalez* involved consolidated actions of retaliatory discharge for exercising workers' compensation rights. *Id.* The employer raised the affirmative defenses of preemption and exhaustion of remedies, both of which were stricken by the trial court. *Id.* at 6. Our supreme court affirmed, rejecting the argument that federal law vesting jurisdiction over suits for breach of collective bargaining agreements in the federal courts preempted the tort claim. *Id.* at 12. Turning to the exhaustion defense, the court declined the employer's invitation to overrule *Midgett v. Sackett-Chicago, Inc.* 105 Ill. 2d 143 (1984), which held that unionized employees need not plead exhaustion of their CBA's grievance procedure. *Gonzalez*, 115 Ill. 2d at 12-13. Both rulings in *Gonzalez* were grounded in the court's view that the right to sue for retaliatory discharge was "firmly rooted in the clearly mandated public policy of this State" (*id.* at 9), "wholly separate and independent from any contract-based action" (*id.* at 10), and "not in any way derived from the [collective bargaining] agreement" (*id.* at 14).

¶ 66    It is apparent that *Beckman*, in relying on *Gonzalez*, was applying the same-evidence test for assessing whether an identity of causes of action existed. Because we now use the transactional test to determine the identity-of-causes-of-action elements of *res judicata* (*River Park, Inc.*, 184

Ill. 2d at 310-11), *Beckman* has little relevance here. See *Chicago Board of Education*, 2024 IL App (1st) 240613, ¶ 35 ("These cases demonstrate that the Union's assertion of a different legal theory does not make the causes of action different for *res judicata* purposes."). Thus, Dickerson's argument is based on outdated precedent.

¶ 67 We acknowledge that Dickerson interposed retaliation as a defense in the arbitration proceeding rather than advancing the theory as a counterclaim; however, this does not affect the outcome of this appeal. First, *res judicata* applies to issues that could have been raised in addition to those that actually were raised. *Kasny*, 395 Ill. App. 3d at 873. Second, "the doctrine [of *res judicata*] bars claims based on facts that would have constituted a counterclaim or defense in the earlier proceeding where successful prosecution of the later action would either nullify the earlier judgment or impair the rights established in the earlier action." *Cabrera v. First National Bank of Wheaton*, 324 Ill. App. 3d 85, 92 (2001).

¶ 68 Additionally, while counterclaims are typically regarded as permissive in this state (*Corcoran-Hakala v. Dowd*, 362 Ill. App. 3d 523, 530 (2005) ("[I]n Illinois, counterclaims are generally permissive rather than mandatory.")), in certain circumstances, they are *de facto* compulsory. See *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 51 ("The danger in choosing not to bring any permissive counterclaim is that resolution of the earlier litigation may bar the later suit via *res judicata*, but only if the second suit might nullify the results of the first."). The Fourth District, in *Young* (*id.* ¶¶ 48-50), invoked section 22(2)(b) of the Restatement (Second) of Judgments, in addressing an assertion of *res judicata*:

"(2) A defendant who may interpose a claim as a counterclaim in an action but fails to do so is precluded, after the rendition of judgment in that action, from maintaining an action on the claim if[ ]

\*\*\*

(b) *[t]he relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.*" (Emphasis added.) Restatement (Second) of Judgments § 22(2)(b) (1982).

¶ 69     Other Illinois cases have applied section 22 of the Restatement as well. See *Corcoran-Hakala*, 362 Ill. App. 3d at 531 (applying section 22); *Dowrick v. Village of Downers Grove*, 362 Ill. App. 3d 512, 517 (2005) (holding that "Illinois follows the rule stated in section 22 of the Restatement (Second) of Judgments").

¶ 70     Here, plaintiffs' Complaint seeks, *inter alia*, that they "be reinstated with the same seniority they would have had without the violation of the Illinois Whistleblower Act," as well as damages flowing from their discharge. Thus, if Dickerson were successful here, he would undo the result of the earlier administrative proceeding, contrary to the dictates of section 22. *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 42 ("it has been held that *res judicata* bars a subsequent action if successful prosecution of that action would, in effect, nullify the judgment entered in the original action"). That he chose to raise the issue solely as an affirmative defense is of no moment. See *Cabrera*, 324 Ill. App. 3d at 92.

¶ 71     Before closing, we note that Dickerson asserts, relying on various statements and allegations made by defense counsel, that defendants have taken the position that the reasons cited for his termination in the arbitration had nothing to do with the reason cited for his dismissal in the retaliatory discharge action. However, he cites no legal authority in support of this argument, thus forfeiting it. *Graham v. Lakeview Pantry*, 2019 IL App (1st) 182003, ¶ 26. It appears to us that Dickerson is attempting here to invoke the doctrine of judicial estoppel. See *Pepper Construction*

*Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 64 ("The doctrine of judicial estoppel provides that a party who asserts a particular position in a legal proceeding is estopped from asserting a contrary position in a subsequent legal proceeding."). However, that doctrine requires a showing that

> "the party to be estopped must have (1) taken two positions (2) that are factually inconsistent (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending the trier of fact to accept the truth of the facts alleged and (5) have succeeded in the first proceeding and received some benefit from it." *Id.*

At the very least, the third and fifth elements appear to be absent, so Dickerson could not have succeeded with this argument had he not forfeited it. Hence, Dickerson's reliance on counsel's statements is unavailing.

¶ 72    As our supreme court observed in *Village of Bartonville*:

> "The purpose of *res judicata* is to promote judicial economy by requiring parties to litigate, in one case, all rights arising out of the same set of operative facts, as well as to prevent imposing an unjust burden that would result if a party could be forced to relitigate what is essentially the same case." *Village of Bartonville*, 2017 IL 120643, ¶ 78 (holding police officer barred by *res judicata* where he chose to contest his termination with a hearing before the board and then sought arbitration).

Like the officer in *Village of Bartonville*, the facts in Dickerson's arbitration and the facts that would underlie a trial in this matter arose from a single set of operative facts, and the objective in the arbitration was the same as would be in a trial here—the determination of the reason for his termination and to prevent the loss of his job. This Complaint seeks to impose the burden of relitigating issues that were or could have been decided in the arbitration, and so must be precluded.

¶ 73    Accordingly, we hold that the trial court correctly determined that Dickerson's claims are barred by *res judicata*. Under the transactional test, both the arbitration and the subsequent civil suit were based on the same nucleus of operative facts—specifically, Dickerson's discharge. As such, an identity of causes of action existed. Dickerson does not argue that the remaining elements of *res judicata* are absent. We affirm this portion of the trial court's judgment.

¶ 74                              C. Summary Judgment Against Rivera

¶ 75    Finally, we address the issues pertaining to plaintiff Rivera. The trial court granted a defense motion for summary judgment, in which defendants argued that the individual defendants are not Rivera's employer under the Whistleblower Act and that there is no cause of action for constructive discharge in either the common law or the Whistleblower Act. Defendants' motion contended that Rivera was not discharged, " 'constructive' or otherwise." Rather, they argued, Rivera was offered continued employment under the condition that he "walk a beat" on patrol rather than remain an investigator, and in response to this offer, Rivera resigned. We review a grant of summary judgment *de novo*. *West Bend Mutual Insurance Co.*, 2022 IL App (2d) 210506, ¶ 13.

¶ 76    Our analysis of the summary judgment against Rivera is confined solely to his claim under the Whistleblower Act. On appeal, Rivera concedes that Illinois courts do not recognize constructive discharge as a form of retaliatory discharge (see *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 163 (1992) (declining to expand the tort of retaliatory discharge to encompass the concept of constructive discharge)). However, he maintains that he still had a claim under the Whistleblower Act, as the Whistleblower Act's broad language prohibits retaliation rather than termination of employment alone, and that the individual defendants are also liable for violations of the Whistleblower Act.

¶ 77 Defendants contend that plaintiffs' appeal does not sufficiently address these arguments, as Rivera cites only one section of the Whistleblower Act and "does not provide a single case suggesting that this situation would be viewed as covered retaliation under the [Whistleblower Act]." Generally, an argument inadequately supported by citation to relevant authority is deemed forfeited. *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19. However, forfeiture is a prerogative of the court (*People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65; *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 963 (2006)), and as this issue is clearly controlled by the statute at issue, we elect to address this argument. We remind appellants that supreme court rules must be followed. *Epstein*, 2017 IL App (1st) 170605, ¶ 22.

¶ 78 We first address defendants' argument that the individual defendants are not Rivera's employers under the Whistleblower Act. As noted above, the Whistleblower Act broadly prohibits "[a]n employer" from taking "retaliatory action against an employee for disclosing information to law enforcement regarding an activity of the employer that violates a law, rule or regulation." 740 ILCS 174/15(b) (West 2018). The Whistleblower Act's definition of "employer" includes both "a unit of local government" *and* "any person acting within the scope of his or her authority express or implied on behalf of those entities in dealing with its employees." *Id.* § 5. Thus, in contrast to the common law tort of retaliatory discharge (*Buckner*, 182 Ill. 2d at 22 (holding that the tort of retaliatory discharge may be committed only by the employer)), the Whistleblower Act includes both local public entities and their employees as potential defendants. Accordingly, based on the plain language of the Whistleblower Act, we find that both the Village and the individual defendants were properly named, and because there remain disputed issues of material fact, summary judgment on the ground that the individual defendants were not employers was improper.

¶ 79 Turning to the next issue, defendants argue that because Rivera was not fired, and instead resigned, Rivera's claims are barred because Illinois law does not recognize a claim for constructive discharge. We find *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, instructive on the matter. In *Young*, the plaintiff worked at a long-term care facility. *Id.* ¶¶ 1, 3. After refusing to comply with a request by her supervisor to falsify residents' medication administration records, the plaintiff claimed that she had been constructively discharged. *Id.* ¶¶ 6-7. She testified that, after refusing to falsify records and reporting the conduct, her hours were reduced at work, she was no longer asked to fill in for available shifts, she was no longer asked to train staff, and her performance evaluations were not as favorable as before. *Id.* ¶ 21. The plaintiff testified that, after her hours were reduced, she began looking for and eventually accepted other employment. *Id.* ¶ 23. In her action against her employer, the plaintiff in *Young* alleged, as relevant here, a claim of constructive discharge under the Whistleblower Act. *Id.* ¶ 3. However, although her complaint did not specifically refer to section 20 of the Whistleblower Act (740 ILCS 174/20 (West 2018) (forbidding retaliation for refusing to violate the law)), the trial court construed the latter claim as being brought under that section and denied the defendant's motion for summary judgment with respect to the count of constructive discharge alleged under the Whistleblower Act. *Young*, 2015 IL App (1st) 131887, ¶ 56.

¶ 80 On appeal, the defendant in *Young* argued that the plaintiff had not adequately pled a claim under the Whistleblower Act and should not have been allowed to proceed to trial on that basis. *Id.* ¶ 55. The appellate court affirmed the denial of summary judgment on that count, stating that it was "sufficient" that the plaintiff had adequately pleaded a violation of the Whistleblower Act, "especially given that [the plaintiff] *specifically alleged that she was constructively discharged* from her employment because of her refusal to follow [her supervisor's] request to falsify medical

records." (Emphasis added.) *Id.* ¶ 56. Therefore, the *Young* court expressly held that constructive discharge was actionable pursuant to the Whistleblower Act.

¶ 81    Additional guidance can be found in *Brame v. City of North Chicago*, 2011 IL App (2d) 100760. In *Brame*, the plaintiff, a police officer, sued the defendant city and city officials after alleged retaliation in violation of the Whistleblower Act following his disclosure of information concerning what he believed was criminal activity committed by the police chief. *Id.* ¶ 1. The trial court granted the defendant city's motion for summary judgment. *Id.* ¶ 2. The city argued that it was entitled to summary judgment because the plaintiff's reassignment to the midnight shift could not be viewed as retaliation under the Whistleblower Act. *Id.* ¶ 13. On appeal, this court disagreed, reversing the grant of summary judgment and declining to hold that a shift change could never be actionable retaliation under the Whistleblower Act. *Id.* The *Brame* court construed section 15(b) of the Whistleblower Act, which provides that an employer may not take *retaliatory action* against an employee (740 ILCS 174/15(b) (West 2018)). The court explained, "The language of the [Whistleblower Act] is plain and consistent. Clearly, the legislature intended to afford relief to employees retaliated against by their employers for reporting criminal activity to government or law-enforcement agencies." *Brame*, 2011 IL App (2d) 100760, ¶ 8.

¶ 82    The appellate court also considered the contours of what conduct would support a claim under the Whistleblower Act in *Svec v. City of Chicago*, 2024 IL App (1st) 230893. In that case, the City of Chicago contested a jury verdict in favor of a police officer who alleged that an assignment to the midnight shift was retaliation under the Whistleblower Act. After considering its legislative history, the appellate court interpreted the Whistleblower Act to require that actionable retaliation take the form of a "materially adverse act under any circumstance" affecting employment or the terms and conditions of employment. *Id.* ¶ 73. *Svec* held that the Whistleblower

Act contemplates retaliation in the form of acts or omissions that "inflict significant, rather than trivial, harm and must 'likely *** dissuade' a reasonable employee from disclosing" the alleged wrongdoing. *Id.* ¶ 74 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006)). In affirming the verdict for the police officer, the court held that " 'undesirable job assignments and lateral transfers' *can* support a charge of retaliation in the right context." (Emphasis in original.) *Id.* ¶ 83 (quoting *Hoffelt v. Department of Human Rights*, 367 Ill. App. 3d 628, 637 (2006)).

¶ 83    In short, the plain language of the Whistleblower Act does not limit itself to retaliation in the form of termination but broadly proscribes "retaliatory action." Here, Rivera alleged that, as a result of his whistleblowing activities, he was told that he could only stay on the force if he agreed to "walk a beat" as a patrolman instead of continuing to serve as an investigator. Because an undesirable job assignment can constitute a materially adverse employment action, we hold that there is a fact question as to whether the proposed reassignment constituted retaliatory action. See *id.* ¶ 84 ("The evidence thus supports the jury's determination that plaintiff suffered retaliation under sections 15(b) and 20 of the Whistleblower Act."); *cf. Brame*, 2011 IL App (2d) 100760, ¶ 13 (declining to hold that a shift change can never be actionable retaliation under the Whistleblower Act). Accordingly, we find that the trial court erred in granting summary judgment with respect to Rivera's claim under the Whistleblower Act and affirm its grant of summary judgment on the common law retaliatory discharge count.

¶ 84                                III. CONCLUSION

¶ 85    In summary, we reject the alternative grounds offered by defendants for affirmance; because defendants' motion for summary judgment failed to satisfy their initial burden of production, the burden to present a factual basis for their Complaint never shifted to plaintiffs.

Regarding Sciarrone's retaliatory discharge claim, the Village enjoys immunity from suit as stated in section 2-103 of the Immunity Act, and so the grant of summary judgment in its favor against Sciarrone on count II was not error. But count I was predicated on the Whistleblower Act, which exposes both local public entities and their employees to liability for conduct forbidden by the Whistleblower Act and for which there is no tort immunity. Therefore, summary judgment on count I against Sciarrone and in favor of the Village and individual defendants was improper and is reversed. Plaintiff Dickerson's claims are barred by *res judicata*; thus, we affirm the trial court's grant of summary judgment against Dickerson and in favor of all defendants. Finally, because a constructive discharge cannot support an action for retaliatory discharge, summary judgment against plaintiff Rivera and in favor of the Village as to count II is affirmed. But because the plain language of the Whistleblower Act exposes both the employer and persons acting on its behalf to liability for retaliatory actions, not just discharge, summary judgment against Rivera and in favor of the Village and the individual defendants as to count I was not proper and is reversed.

¶ 86    Accordingly, the judgment of the circuit court of Lake County is affirmed in part and reversed in part. This cause is remanded for further proceedings consistent with this opinion.

¶ 87    Affirmed in part and reversed in part; cause remanded.

*Sciarrone v. Village of Island Lake*, **2025 IL App (2d) 240153**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 20-L-730; the Hon. Luis A. Berrones, Judge, presiding. |
| **Attorneys for Appellant:** | Richard D. Grossman, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Matthew A. Hurd and Mary Jean Dolan, of Ancel Glink, P.C., of Chicago, for appellees. |